DAVID H. SCHULTZ, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

BESSIE SCHULTZ, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

DAVID H. SCHULTZ AND BESSIE SCHULTZ, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 54845, 54846, 54847. Filed May 13, 1958.

*John E. Pledger, Jr., Esq., John E. Pledger, Sr., Esq.*, and *E. N. Bender, Esq.*, for the petitioners.

*Robert L. Liken, Esq.*, for the respondent.

These consolidated proceedings involve deficiencies in income tax and additions thereto in the following amounts:

| Docket No. | Year | Petitioner | Deficiency | Additions to tax | | |
|---|---|---|---|---|---|---|
| | | | | Sec. 293(b) | Sec. 294(d) (1) (B) | Sec. 294(d) (2) |
| 54845 | 1946 | David H. Schultz | $14,720.16 | $7,435.21 | | $884.83 |
| | 1947 | David H. Schultz | 12,352.16 | 6,176.08 | | 912.09 |
| 54846 | 1946 | Bessie Schultz | 14,534.91 | | | 872.89 |
| | 1947 | Bessie Schultz | 12,266.66 | | | 893.56 |
| 54847 | 1948 | David H. and Bessie Schultz | [1] 5,774.86 | 2,887.43 | $100.00 | 262.11 |
| | 1949 | David H. and Bessie Schultz | 27,784.16 | 13,892.08 | | 1,440.97 |

[1] In the summary "statement" accompanying the deficiency notice attached to the petition in Docket No. 54847 the deficiency for 1948 is stated to be $6,774.86. However, the detailed computations in the "statement" show the correct amount as $5,774.86. The parties have repeated the error in their pleadings and on brief.

Respondent determined petitioners' income for the taxable years 1946 through 1949 on the net worth plus personal expenditures basis. The issues for decision are: (1) What was the amount of cash on hand held by petitioners at January 1, 1946; (2) did petitioners have a loan receivable as of January 1, 1946, which should have been included in

their opening net worth for that year; if so, what was the amount of that loan receivable, and did it become worthless in any of the years here in issue; (3) did a debt of a partnership, of which David H. Schultz was a member, represented by bank draft dated December 27, 1946, constitute a liability which should have been taken into account in petitioners' closing net worth as of December 31, 1946; (4) did the amounts lent to John and Austin Schalker during 1944 constitute a business debt; and if so, was it deductible by petitioners in 1947 when the debtors were adjudged bankrupt; (5) did petitioners sustain a loss from theft in 1947 upon the purchase of a franchise to remove bananas from a specific part of Haiti; (6) what was the amount of David H. Schultz's investment in the corporation Compania de Navigacion Farber-Jeter at the end of 1947, 1948, and upon its dissolution in 1949; (7) did the amount of $1,000 represented by a check drawn by David H. Schultz in favor of Alex Nathan constitute a loan, or was it a commission for services rendered which should be excluded from petitioners' closing net worth for 1949; (8) should the nontaxable portion of capital gains realized by petitioners during any of the years in issue be excluded from assets which appear on the net worth statement in subsequent years; and (9) was any part of the deficiencies in Docket Nos. 54845 and 54847 due to fraud with intent to evade tax?

All other issues raised by the pleadings have been conceded by the parties.

Some of the facts were stipulated.

### FINDINGS OF FACT.

The stipulated facts are so found and are incorporated herein by this reference.

During the years in issue, petitioners David H. and Bessie Schultz, husband and wife, resided in Houston, Texas. They filed separate returns on the community property basis for the calendar years 1946 and 1947, and joint returns for the calendar years 1948 and 1949, with the then collector of internal revenue for the first district of Texas. During those years, they reported their income on the cash receipts and disbursements basis. The only income reported on their returns for 1946 resulted solely from the efforts of petitioner David H. Schultz. Unless otherwise noted, David H. Schultz will be referred to hereinafter as the petitioner.

During all of the years involved herein, petitioner was engaged in the wholesale produce business and related enterprises. Until June 1944, and for several years prior thereto, he was the sole proprietor of a business known as White House Produce Company. He sold that business in June 1944, and, after about 2 months, he spent ap-

proximately a week at Mayo Brothers Clinic. Upon his return to Houston, he became a partner in a produce business known as M. Morales Company. He disposed of his interest in that firm in January of 1945. In March 1945 he commenced business as David H. Schultz and Company, a sole proprietorship. On November 7, 1947, that company became the National Banana and Tomato Company, a Texas corporation. During 1946, 1947, and 1948, petitioner was a partner in the Roatan Banana Company. During 1947 he was a partner in the Farber-Jeter Shipping Company, which subsequently became Compania de Navigacion Farber-Jeter, a Panamanian corporation, and was a stockholder in the National Banana and Steamship Company, a Haitian corporation.

At all times material hereto, petitioner handled little cash in connection with his business transactions. Normally, any cash possessed by petitioner, outside of that maintained in bank accounts, was kept either on his person or in a safe-deposit box.

Petitioners' cash on hand was $440 as of January 1, 1946, $880 as of December 31, 1946, $1,320 as of December 31, 1947, $1,760 as of December 31, 1948, and $2,200 as of December 31, 1949.

During the years 1944 and 1945, petitioner engaged in certain business transactions with Eli Laviage. In December 1945, in connection with one of those transactions, petitioner advanced to Laviage approximately $4,000 with which to purchase a truckload of pecans in the State of Georgia. It was intended that the pecans be taken to Los Angeles and sold, and that the proceeds be used to purchase a load of walnuts to be transported to Houston for sale. Laviage purchased the pecans and trucked them to Los Angeles. However, they arrived later than expected and were refused by the intended purchaser. No remittance was ever received for the pecans. Laviage then loaded his truck with the walnuts, which were paid for by petitioner. The walnuts were transported to Houston where they arrived on December 26, 1945. They also were refused by the intended purchaser, since they had arrived too late for resale during the holiday season. No returns were ever made on the walnuts. As of December 31, 1945, Laviage was indebted to petitioner in an undisclosed amount with respect to merchandise purchased on account from petitioner. In February 1946 petitioner filed a financial statement with the Houston National Bank, which failed to reflect any debt from Laviage as an asset. At the hearing of this proceeding on February 20, 1957, Laviage orally acknowledged indebtedness to petitioner, and stated he hoped some day to pay it.

During 1946, 1947, and 1948, petitioner was a partner in the Roatan Banana Company which, beginning in March 1946, was engaged in the business of importing bananas from Mexico into Brownsville, Texas.

The partnership operated on the basis of a fiscal year ended February 28. In February 1946 petitioner obtained a letter of credit from the Houston National Bank to the Banco Longoria at Matamoros, Mexico, in the amount of $50,000. On the strength of the guaranty embodied in that letter of credit, the bank at Matamoros extended credit to petitioner and the Roatan Banana Company. When Roatan purchased a shipment of bananas in the State of Tabasco, Mexico, a draft in respect of their purchase price would be drawn by the vendors on petitioner's credit at the Matamoros bank. The bananas would then be shipped to Brownsville, a journey of some 48 to 60 hours, where they would be unloaded and immediately sold. The bank draft would arrive at the Matamoros bank some 6 to 10 days after its issuance. The liability represented by those drafts was that of the Roatan Banana Company. Roatan always paid the drafts when presented to the Matamoros bank. On December 27, 1946, a draft in the amount of $13,923.36 was drawn on petitioner's letter of credit by a confederation of banana growers in the State of Tabasco, Mexico. That draft was paid on January 2, 1947, by the Roatan Banana Company. Prior to the close of the calendar year 1946, petitioner withdrew from Roatan at least $22,138.97 representing his distributive share of the partnership profits for its fiscal year ended February 28, 1947.

John Schalker and Austin Schalker, brothers, were in the horse-meat business. In the spring of 1944, Schultz began to make certain advances to the Schalkers. On May 20, 1944, Schultz and the Schalkers formalized their arrangements by entering into certain agreements whereby it was agreed that Schultz would advance or lend the Schalkers various amounts of money in consideration of interest at the rate of 10 per cent per annum. It was further agreed that those advances were to be secured by the assignment of certain accounts receivable of various business enterprises in which the Schalkers were then engaged. As payments were made on these accounts receivable, they were deposited in a special account in petitioner's name with the First National Bank in Houston. Schultz made such advances over an aggregate period of about 6 weeks, and then ceased. On June 16, 1947, the Schalkers filed a petition in bankruptcy in the United States District Court for the Southern District of Texas. On August 6, 1947, they were adjudged bankrupt. On February 16, 1948, Schultz filed a proof of claim against the Schalkers alleging they were indebted to him in the sum of $22,743.12. Of that amount, $18,117.01 resulted from the arrangements between himself and the Schalkers which were spelled out in the agreements of May 20, 1944. On March 26, 1949, the Schalkers were discharged from bankruptcy. On February 25, 1953, the final report of the trustee in bankruptcy was approved, which indicated that $1,346.77 was to be paid to Schultz. In computing their income for the calendar year 1947, petitioners claimed the

Schalker debt as a long-term capital loss. At the time that Schultz commenced to make the advances to the Schalkers he was the sole proprietor of a produce business which he sold in June 1944. The Schalker loans were not proximately related to that business or to any other trade or business in which he was engaged during any of the years involved. He had never made similar loans to others, nor was he in the lending business. The debts arising out of the loans to the Schalkers were nonbusiness debts, and did not become totally worthless during any of the years 1946–1949.

In August 1947, petitioner and Nicholas D. Allen entered into negotiations with a group of Haitians (including the President, Cabinet members, and senators of the Republic of Haiti) from whom they wished to acquire a franchise which would grant them a monopoly for 5 years to purchase all the bananas produced in the southern half of the southern peninsula of Haiti, in an area some 120 miles in length and an average of 50 miles in depth. They contemplated importing the bananas into the United States for sale. At the outset, the Haitian group indicated the cost of the franchise would be $800,000. However, after a brief period of negotiation they lowered their price to $100,000. To induce petitioner and Allen to enter into the purchase of the franchise, the Haitian group showed them certain production records which purportedly represented the franchise area banana yield at 120,000 payable stems of bananas per month. After bargaining for several days, and without physically examining the area covered by the franchise, petitioner and Allen agreed to purchase the franchise. It was further agreed that the franchise would be contributed to a corporation to be organized to conduct the business; that the Haitian group would receive a 50 per cent interest in that corporation; and that petitioner and Allen should have the remaining interest. In September 1947, petitioner and Allen purchased the franchise. Thereupon, the National Banana and Steamship Company, a Haitian corporation, was formed. The franchise was then contributed by petitioner and Allen to the corporation. In accordance with their agreement they transferred 50 per cent of the stock of that corporation to the Haitian group and divided the remainder equally between themselves. During the first 2 months the corporation received some 40,000 stems per month from the area and the business showed a small profit. However, the total franchise area yield was unknown due to the fact that some of the fruit was diverted to interests other than those of the corporation. Thereafter, the corporation received very little from the area. Within a few months after operations had commenced, petitioner and Allen concluded that the franchise was worthless and made attempts to salvage whatever they could from the deal. Petitioner's total investment in the franchise did not exceed $67,500.

In 1946, petitioner and three others formed a partnership known as the Farber-Jeter Shipping Company to haul bananas from Mexico to the United States. Two of the partners contributed $7,500 each to the business. The remaining investment, at all times material hereto, was equally divided between petitioner and the third partner. Petitioner maintained no personal record of his investment in the partnership. Early in 1947, Valentin Fuente made a loan to the partnership in the amount of $30,500. Fuente has never been repaid any part of that loan. The parties are in agreement that in computing petitioner's investment in the enterprise an adjustment must be made in the amount of one-half of the Fuente loan.

The partnership was incorporated under the laws of Panama on October 21, 1947, as the Compania de Navigacion Farber-Jeter. That corporation was dissolved in February 1949. Upon dissolution, the sole asset petitioner received in distribution was the motor vessel "Bill Phil" having a fair market value of $12,000. As of December 31, 1947 and 1948, petitioner's investment in the corporation was $26,772.75.

In 1949 petitioner purchased a laundry business with the help of Alex Nathan. Some 2 months thereafter, Nathan came to petitioner and requested a loan of $1,000. On July 5, 1949, petitioner drew a personal check for $1,000 in favor of Nathan which bore the notation "loan." Nathan has never repaid petitioner any part of that $1,000. The transaction was in fact a loan; it did not represent the payment of a commission to Nathan.

During the fiscal year ended February 28, 1947, petitioner and three others comprised the partnership known as the Roatan Banana Company, referred to above. Throughout that period Roatan was actively engaged in importing bananas into Brownsville, Texas, from the States of Tabasco and Chiapas, Mexico. When Roatan purchased a boatload of Tabasco bananas, the vendors prepared a statement of the transaction, setting forth the name of the vessel upon which the fruit was shipped, the date of its unloading at Brownsville, the kind and quantity of the bananas purchased, and the total sales price paid by Roatan. Roatan also prepared a "sales sheet" of the transaction, setting forth the name of the vessel, date of unloading, kind and quantity of the fruit unloaded, the ultimate purchaser, and the total purported sales price received. A comparison of 68 statements rendered by the vendors, with corresponding "sales sheets" prepared by Roatan, covering transactions occurring from March 6, 1946, through December 29, 1946, revealed that in 61 instances the purported sales price set forth on the Roatan sales sheet was substantially less than the purchase price shown on the vendors' statement. The total discrepancy between the 61 statements and sales sheets was approxi-

mately $256,961.54. Roatan never paid more for bananas than they were worth in the United States.

The accountant who prepared the Roatan partnership return for the fiscal year ended February 28, 1947, totaled the sales as set forth on the Roatan "sales sheets" for that year. He then took 5 per cent of the total sales for the year, arriving at a figure of $88,555.89 which he entered on the Roatan return as the partnership net income for that year. No deductions were claimed on the return. Petitioner's distributive share of the partnership net income was reported as $22,138.97, which amount petitioners used in computing their community income for the calendar year 1947.

During 1946 petitioner, operating a sole proprietorship under the name of David H. Schultz & Company, made sales of bananas to J. J. Butler at prices in excess of the established O.P.A. ceiling prices. Butler drew checks in the total amount of $21,408.36 which he gave to petitioner in payment for those bananas. No part of that $21,408.36 was recorded on the books of David H. Schultz & Company. Such amount was also omitted from petitioners' community income for the calendar year 1946.

The L & L Banana Company was a partnership formed during 1947 for the purpose of hauling bananas by truck from Brownsville, Texas. Though petitioner was not a partner in that concern, he made certain advances to the partnership throughout 1947, 1948, and 1949. The amounts so advanced by petitioner represented a loan receivable to him. Petitioner had no record of the advances made by him to the L & L Banana Company.

In December 1948, a fire destroyed the warehouse in which the main office of the Roatan Banana Company was located. Substantially all of the Roatan business records then in existence were burned in that fire. Also destroyed by the same fire were all the records of the Farber-Jeter Shipping Company for the periods preceding December 1948.

On January 29, 1953, a Federal grand jury, sitting in the Austin Division of the United States District Court for the Western District of Texas, returned a two-count indictment against petitioner. Count one charged him with a willful attempt to evade his Federal income tax for the calendar year 1946 by filing a false and fradulent return for that year, wherein he stated his net income, computed on the community property basis, was $5,136.12 when he knew it was $19,548.06. Count two charged him with a willful attempt to evade the Federal income tax owing by his wife, petitioner Bessie Schultz, for the calendar year 1946, by filing a false and fraudulent return on her behalf for that year which stated her net income, computed on the community property basis, to be $5,136.12, when he knew it to be $19,548.05. On

June 10, 1953, petitioner entered a plea of guilty to the second count of that indictment, whereupon, on motion of the United States attorney, the first count was dismissed.

The petitioners have extended, by timely execution of forms 872, the periods of limitation for the assessment and collection of income tax for the calendar years 1946, 1947, 1948, and 1949, to dates subsequent to the date of issuance of the deficiency notices in each of the instant proceedings.

Respondent determined, by the use of the net worth and expenditures method, that petitioners received income in excess of that reported on their returns for the years 1946, 1947, 1948, and 1949. Both parties have made certain basic concessions with respect to the items appearing in that net worth statement. As a result of those concessions, the parties' original positions have been materially altered. The following table shows the amounts of community net income or loss reported by petitioners in their returns, the increases in net worth and their net community income based upon items in the net worth statement which were not in issue herein or which the parties have since conceded, and the increases in their net worth and the amounts of net community income which reflect respondent's present position based upon items conceded as well as those still in dispute:

| Year | Net income reported | Petitioner | | Respondent | |
|------|---------------------|------------|---|------------|---|
| | | Increase or decrease in net worth | Net income received | Increase in net worth | Net income claimed on brief |
| 1946 | $11,488.94 | $22,720.44 | $42,075.23 | $29,686.62 | $49,041.41 |
| 1947 | 31,354.12 | (44,762.22) | (36,805.47) | 44,138.61 | 43,713.99 |
| 1948 | 15,278.44 | 23,027.67 | 34,511.28 | 23,027.67 | [1] 44,181.58 |
| 1949 | (32,404.96) | 73,852.50 | 66,582.16 | 76,802.83 | 69,657.49 |

[1] In his pleadings, respondent determined that petitioners received net income in 1948 in the amount of $34,364.55.

A part of the deficiencies in Docket Nos. 54845 and 54847 for each of the years 1946, 1947, 1948, and 1949 was due to fraud with intent to evade tax.

### OPINION.

RAUM, *Judge:* Respondent determined petitioners' net income for the years 1946 through 1949 by the increase in net worth plus nondeductible expenditures method. The petitioners, on brief, do not contest the use of this method, and any objection thereto must consequently be deemed to have been waived. In any event, the use of this method is clearly warranted on this record.

The trial of this case was concerned primarily with the correctness or incorrectness of certain items appearing on the net worth statement used by the Government, Exhibit 39–MM. The parties were in

agreement as to most of the items, and have since, on brief, reached agreement as to certain others. There remain for decision only the items discussed below.

1. *Opening net worth for 1946 and cash on hand at beginning of each year.*—The opening net worth for 1946 is shown as $141,331.13 in the statement. Petitioners contend that this is incorrect in two respects: It fails to give them any credit for cash on hand (claimed to be $2,200) and it does not include an asset in the amount of $10,000 referred to by them as the "Laviage" loan. At the outset, a rough check on the accuracy of the opening figure of $141,331.13 may be had by comparing it with financial statements (incorporated in the findings as part of the stipulation) filed by Schultz with a bank for credit purposes which disclosed a net worth of $123,824.32 as of February 28, 1946, and $98,121.17 as of February 5, 1945. These alone would justify the conclusion that there was no substantial understatement in the opening figure of $141,331.13 as of January 1, 1946. Moreover, the evidence shows that during the course of the investigation in this case Schultz and his attorney admitted an opening net worth of approximately $142,000.

(a) *Cash on hand.*—The net worth statement shows cash on hand in the amount of $2,200 as of December 31, 1949, but fails to show any cash on hand for any of the other dates during the 4-year period here involved. There is no dispute as to the $2,200 as of the close of the period, which was found shortly thereafter in Schultz's safe-deposit box, but petitioners contend that they had that amount of cash on hand at the beginning of the period as well. However, Schultz's testimony indicated that he ordinarily had only a small amount of cash, and we are far from satisfied by the evidence that the $2,200 found in the box after 1949 was there continuously during the 4-year period before the Court. Nevertheless, we think that the Commissioner erred in failing to credit petitioners with any cash on hand on any date other than the end of 1949. Indeed, he now suggests on brief that the Court might reasonably find that the safe-deposit box contained $500 at the beginning of the period. The matter calls for the exercise of our best practical judgment on the record, and we have found that petitioners had cash on hand in the amount of $440 as of January 1, 1946; $880 as of December 31, 1946; $1,220 as of December 31, 1947; $1,760 as of December 31, 1948; and $2,200 as of December 31, 1949. Cf. *Cohan* v. *Commissioner*, 39 F. 2d 540, 544 (C. A. 2).

(b) *Laviage loan.*—Petitioners contend that they are entitled to have an item of $10,000 added to their opening net worth for 1946 representing an alleged loan made by Schultz to a man named Eli Laviage. The evidence in respect of this item was vague and unsatisfactory. No checks, notes, or other documents were presented. The

amount of the alleged loan was nowhere stated with any degree of accuracy. This so-called loan represents in part an account receivable for merchandise sold to Laviage by Schultz. But Schultz was then doing business through a sole proprietorship named David H. Schultz & Company (which maintained an accounts receivable ledger), and his accounts receivable would be reflected in the computation of his capital account in that proprietorship, which in turn would appear on the net worth statement under "Investments," "David H. Schultz & Company." Accordingly, to the extent that the Laviage item includes an account receivable for merchandise, it would be a duplication to list it separately as an asset as of January 1, 1946.

As to the remainder of the item, it appears that Schultz advanced about $4,000 to Laviage to purchase pecans in Georgia for delivery in California by truck. The purchaser refused to accept the pecans, and the transaction resulted in a loss. Laviage then purchased a truckload of walnuts in California with funds in an undisclosed amount said to have been made available by Schultz. He brought the walnuts back to Texas, but the intended purchaser refused to take them, and that aspect of the transaction resulted in a loss. Whether there was a genuine loan to Laviage in connection with the pecan and walnut transaction, or whether Schultz in some other fashion participated with Laviage in these ventures which resulted in losses, is far from clear on the record. Conceivably, what we have here may be nothing more than losses which occurred prior to the beginning of the period before us, and therefore have nothing to do with this case. Indeed, Schultz testified that he regarded the Laviage matter as a "bad investment" soon after he went into it, and he did not include any amount relating thereto as an asset in the financial statement which he filed with the bank for credit purposes on February 28, 1946.

On the other hand, even assuming that the pecan and walnut transaction did result in a true loan resulting in a debt running from Laviage to Schultz, there is no persuasive evidence that it became worthless during any of the years before the Court. Laviage testified in this proceeding that he still hopes to repay Schultz, and the possible running of a Texas statute of limitations on the claim would not necessarily render it deductible as a worthless debt. Unless the debt were in fact worthless, a creditor would not be entitled to a deduction by voluntarily permitting the period of limitations to expire, cf. *Earl* v. *Perry*, 22 T. C. 968, 974; nor would the statute of limitations be a bar unless specially pleaded.[1] Cf. *Leo Stein*, 4 B. T. A. 1016,

---

[1] Of course, if the Laviage loan were properly includible in the opening net worth figure, and if it did not become worthless during any of the years before the Court, it would likewise have to be included in the closing figure for each year. The result would then be that it would have no effect whatever in the computation of the *increase* in net worth from year to year. Similarly, if it does not appear at all at the beginning and end of each of the years involved, the result would be the same.

1017; *Ralph H. Cross*, 20 B. T. A. 929, 931, affirmed 54 F. 2d 781 (C. A. 9) ; *Charles N. Spratt*, 43 B. T. A. 503, 517.

In view of the state of the record with respect to this item, and particularly in view of the strong inference that the total opening net worth for 1946 in any event did not exceed $142,000, we are of the opinion that the Commissioner did not err in refusing to add the so-called Laviage loan as an asset.

2. *Roatan bank draft—closing net worth for 1956.*—Petitioners contend that their liabilities as of December 31, 1946, should be increased by at least one-half of a bank draft in the amount of $13,932.36 outstanding against Schultz's letter of credit at the close of 1946. The draft had been drawn on December 27, 1946, by Mexican banana growers in connection with a sale of bananas to Roatan Banana Company, a partnership in which Schultz was one of four partners. However, the primary liability in relation to that draft was on Roatan, and Schultz's position, in substance, was that of a guarantor. Moreover, Roatan, in fact, discharged its liability by payment on January 2, 1947.

While it is true that Schultz was a partner in Roatan and was liable as such for its debts, he, in turn, would have a right to obtain contribution from his partners—an asset which would in large part offset that liability. However, the matter does not end there, and we are satisfied on this record that petitioners are not entitled to any adjustment on the net worth statement by reason of this item. The record shows that by the end of 1946, Schultz had already withdrawn from Roatan at least the full $22,138.97 representing his distributive share of Roatan's alleged net income for the fiscal year ending February 28, 1947. Included in the computation of that net income was the very transaction involving the draft in issue. In this respect, it reflected, in toto, the income tax consequences of Schultz's relationship to Roatan for its fiscal year ending February 28, 1947. And since the Commissioner has agreed that petitioners are entitled to increase their liabilities [2] as of December 31, 1946, to reflect the $22,138.97 thus withdrawn by Schultz, that adjustment gives full effect taxwise to Schultz's rights and obligations with respect to all items entering into the computation of the foregoing distributive income of Roatan. If his liabilities were further increased by one-half or by any portion of the $13,932.36 draft as of the end of 1946, the result would be a

---

[2] Perhaps, as a matter of nomenclature, it would have been more appropriate not to characterize this adjustment as an increase in liabilities, for it may be doubtful whether Schultz had any such liability to Roatan. However, since the partnership did have a fiscal year ending February 28, 1947, and since Schultz had already withdrawn his share of the distributive income for that fiscal year prior to the end of 1946—income that presumably was reflected in his assets as of the end of 1946—it was imperative that an offsetting adjustment be made so as to eliminate that income from his taxable net income for 1946 and shift it to 1947 where it properly belongs. Nevertheless, such adjustment need not have been characterized by misleading terminology as an increase in liabilities.

distortion of income: On the one hand, it would unjustifiably reduce petitioners' 1946 net income by the amount of the adjustment, while, on the other hand, it would at the same time increase their 1947 net income by the same amount, because the elimination of that liability on January 2, 1947, would have the effect of augmenting petitioners' increase in net worth during 1947 by that very amount. In short, petitioners' contention in substance calls merely for a shifting of income from 1946 to 1947—a shift that is unsound, since all of Schultz's distributive share of Roatan's reported net income for the fiscal year ending February 28, 1947, has already been properly shifted to 1947 by the $22,138.97 adjustment. Cf. *Hiram C. Wilson*, 17 B. T. A. 976, 979. We conclude that petitioners are not entitled to have their liabilities increased, as of the end of 1946, by the amount of the draft or any portion thereof.

3. *Schalker bad debt.*—Petitioners next contend that the amount of $18,117.01, representing unpaid advances made to the Schalkers during 1944, constituted a business bad debt within the meaning of section 23 (k) (1), deductible in 1947 when the debtors were adjudged to have been bankrupt. They therefore maintain that their net worth as of December 31, 1947, should be adjusted to give effect to that deduction. Respondent's position, on the other hand, is that the amount in issue constituted a nonbusiness bad debt, and as such was deductible, pursuant to section 23 (k) (4), only in the year of its total worthlessness, 1953, a year not presently before the Court. For the reasons hereinafter set forth, we agree with the respondent.

Section 23 (k) (1) of the 1939 Code allows an individual to deduct from his gross income those debts which become partially or totally worthless during the taxable year; however, the benefits of that subsection are specifically denied nonbusiness bad debts, as defined in 23 (k) (4),[3] which are deductible only as short-term capital losses in the year of their total worthlessness. Therefore, we must decide

---

[3] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

* * * * * * *

(k) BAD DEBTS.—

(1) GENERAL RULE.—Debts which become worthless within the taxable year. * * * and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. * * * This paragraph shall not apply in the case of a taxpayer, other than a corporation, with respect to a non-business debt, as defined in paragraph (4) of this subsection.

* * * * * * *

(4) NON-BUSINESS DEBTS.—In the case of a taxpayer, other than a corporation, if a non-business debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. *The term "non-business debt" means a debt other than a debt evidenced by a security as defined in paragraph (3) and other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.* [Italics supplied.]

whether the Schalker advances constituted business or nonbusiness bad debts and whether they became partially or totally worthless in 1947.

It is well settled that whether a debt is one deductible under 23 (k) (1) or under (k) (4) is a question of fact to be determined as of the year in which the worthlessness actually occurs. If, at that time, the loss resulting from the worthlessness is proximately related to the taxpayer's then trade or business, the debt is one deductible under (k) (1). On the other hand, if no such proximate relationship exists, the debt is deductible only as a nonbusiness bad debt under (k) (4).

The scope of section 23 (k) (1) and (4) in this respect was plainly outlined in the reports of the Congressional committees accompanying the 1942 bills which first incorporated these provisions. Thus, the House Ways and Means Committee stated (H. Rept. No. 2333, 77th Cong., 2d Sess., pp. 76–77) :

A new provision is added providing for special treatment of nonbusiness debts, applicable in the case of a taxpayer other than a corporation. * * * The provisions of section 23 (k) (1), as amended by this section, with respect to a debt which has become partially worthless, do not apply in the case of a nonbusiness debt; and a loss with respect to such a debt will be treated as sustained only if and when the debt has become totally worthless. * * * A nonbusiness debt is defined as a debt other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business, and other than a debt evidenced by a security as that term is defined in section 23 (k) (3) of the Code. The question whether a debt is one, the loss from the worthlessness of which is incurred in the taxpayer's trade or business, is a question of fact in each particular case, and the determination is substantially the same as that which is made for the purpose of ascertaining whether a loss from the type of transaction covered by section 23 (e) is "incurred in trade or business" under paragraph (1) of that section. The character of the debt for this purpose is not controlled by the circumstances attending its creation or its subsequent acquisition by the taxpayer or by the use to which the borrowed funds are put by the recipient, but is to be determined rather by the relation which the loss resulting from the debt's becoming worthless bears to the trade or business of.the taxpayer. *If that relation is a proximate one in the conduct of the trade or business* in which the taxpayer is engaged *at the time the debt becomes worthless,* the debt is not a nonbusiness debt for the purposes of this amendment. [Italics supplied.]

A substantially similar statement appears in the corresponding report of the Senate Finance Committee. See S. Rept. No. 1631, pp. 89–90. And the distinctions there drawn were meticulously set forth thereafter in Regulations 111, section 29.23 (k)–6. Cf. *Charles G. Berwind,* 20 T. C. 808, 814–815, affirmed 211 F. 2d 575 (C. A. 3) ; *Hadwen C. Fuller,* 21 T. C. 407, 411–412.

Petitioners have claimed that the worthlessness occurred in 1947, and bear the burden of establishing the relationship between any loss resulting therefrom and a trade or business carried on by Schultz as

of that time. On brief they maintain that at the time the advances were made Schultz was engaged in the trade or business of making loans to the Schalkers. But we have found that he was not in the lending business. Moreover, even if his lending activities in relation to the Schalkers during the brief span of some 6 weeks in the spring of 1944 could be regarded as a trade or business, petitioners' position would still be fatally defective, because, as the italicized language of the foregoing report of the House Ways and Means Committee shows, it is the trade or business of the taxpayer at the time of alleged worthlessness, namely 1947, to which the loss must be related. The advances were made to the Schalkers in the spring of 1944, and were continued over a period of some 6 weeks. They were then discontinued since, as petitioners contend, "the fact became apparent to Schultz that in making these loans he was not as secure as he had previously thought and that in fact he was practically unsecured." Plainly, Schultz was not in any kind of lending business in 1947, the year of claimed worthlessness, and, as we have found, the debts were not proximately related to any other trade or business carried on by him during any of the years involved. Accordingly, we have concluded that the advances were nonbusiness loans and that any loss sustained by petitioners in 1947 as a result of their worthlessness was a loss from a nonbusiness bad debt.

The only identifiable event in 1947 even remotely connected with the possible worthlessness of the Schalker advances was the adjudication of the debtors' bankruptcy. Bankruptcy is generally an indication of the worthlessness of at least part of an unsecured and unpreferred debt, but the burden is on the petitioner to show that there was at that time no reasonable or practical basis for hope that he would receive any return on his loans. Cf. Regs. 111, sec. 29.23 (k) (1); *W. A. Dallmeyer*, 14 T. C. 1282; *Giles E. Bullock*, 26 T. C. 276, affirmed 253 F. 2d 715 (C. A. 2). There is no evidence before us as to the particulars of the Schalkers' financial status in 1947 other than the order adjudicating them bankrupt. On this record, therefore, at best we could conclude merely that the debt became partially worthless in 1947. Since it constituted a nonbusiness bad debt, it could be deducted in that year only if it had become totally worthless. Respondent's denial of petitioners' deduction is therefore sustained.

4. *Haitian banana transaction.*—Petitioners contend that respondent, in computing their net worth, erroneously failed to give effect to an alleged theft loss of $67,500 which they claim was sustained upon the purchase of the Haitian banana franchise in 1947.[4] They argue

---

[4] We have found, in accordance with a proposed finding submitted by respondent and concurred in by petitioners, that Schultz's total investment in the franchise did not exceed $67,500. The net worth statement, however, showed an item of $92,250 for the years ending December 31, 1947–1949. Accordingly, that figure must in any event be scaled down to $67,500. However, if petitioners are correct, the latter amount is deductible in 1947, and therefore should not appear at all on the net worth statement.

that the records produced by the Haitian group, with respect to the franchise area banana yield, were false and fraudulent in that they represented the current yield at 120,000 stems of payables per month when, in fact, actual operations for the first month produced only some 40,000 stems. They maintain that under applicable Haitian law the acts of the Haitian group constituted a swindle or theft, and that therefore Schultz's $67,500 investment in the franchise is deductible as a theft loss in 1947 under the provisions of section 23 (e) (3) of the 1939 Code.

On the other hand, respondent's contention is that no theft under the Penal Code of Haiti has been established by the facts and, further, that any loss which may have been suffered was the result of a bad bargain. Moreover, he contends a valid franchise was received from the Haitian group, and that the loss, if any, occurred after the franchise had been contributed to the corporation, at which time petitioner's investment was in the corporate stock. He therefore argues that the alleged loss could only be the result of the worthlessness of that stock, and since no identifiable event evidencing worthlessness of the stock in any of the years before us has been shown, no adjustment to petitioners' net worth statement is necessary.

Whether a loss from theft, within the meaning of section 23 (e) (3), has occurred depends upon the law of the jurisdiction in which it was sustained; furthermore, the exact nature of the crime is of little importance so long as it constituted a theft under the laws of that jurisdiction. *Edwards* v. *Bromberg*, 232 F. 2d 107 (C. A. 5); *Curtis H. Muncie*, 18 T. C. 849; *Morris Plan Co. of St. Joseph*, 42 B. T. A. 1190.

In support of their position petitioners presented the deposition of Dr. Alexander Adamovitch, an alleged expert witness on the law of Haiti and the holder of the degrees of Bachelor of Laws, Master of Laws, and Doctor of Laws from the University of Paris. He was admitted to the bar in Yugoslavia in 1929, and thereafter conducted a law practice in that country. At the time of the hearing in this proceeding he was employed as a legal analyst in the Law Division of the Library of Congress. His only direct contact with Haitian law was in connection with his preparation for the instant proceeding. He based his testimony on the Haitian Penal Code and on comments made by certain French authorities on the original Penal Code of France which he maintained was substantially similar to the Haitian Code as it existed during 1947. He had never practiced law in Haiti, nor does it appear that he ever practiced law in France.

Respondent objected to Dr. Adamovitch's testimony and moved to strike most of it, alleging the witness had not qualified as an expert on Haitian law. That motion was denied. On brief respondent again challenged Dr. Adamovitch's qualifications. We have read the deposition in an effort to give it such consideration as it may deserve,

but after studying it carefully and taking into account the nature of the testimony and the witness's meager qualifications in relation to Haitian law, we cannot give much weight to it.

Dr. Adamovitch read into the record an English translation of that portion of the Haitian Penal Code pertaining to the crime of theft or swindle as was in effect during 1947.[5] He testified that violation of that provision constituted a felonious act. He further testified that, as he interpreted the law, the essential elements of the crime were a false representation and an external fact to substantiate that representation. Upon an analysis of the factual situation in this proceeding, he concluded that the crime, if any, was committed at the time the franchise was sold. He further concluded that the existence of the crime depended entirely upon whether the statements made by the sellers of the franchise and the records with respect to past production of the franchise area produced by them were true or false. Without a showing that those statements and records were false, Dr. Adamovitch was of the opinion that no violation of this particular portion of the Haitian Penal Code had been established.

From the present record we have no way of determining whether the representations made by the Haitian group as to the franchise area yield were false and fraudulent. That is so because there is no evidence before us as to the actual production statistics from that area up to the date of purchase of the franchise or for any other time. Petitioners point out that operations for the first month produced only some 40,000 stems from the area and argue that that fact indicates the representations of a monthly yield of 120,000 stems were false. However, petitioners concede that the corporation did not receive all the bananas actually produced in the area because of the diversion of some of the fruit to other interests. No record of the number of stems diverted has been produced; nor has any claim been made that such diversion of bananas from the corporation constituted any theft loss to petitioner. Until the number of stems diverted are combined with the number of stems received, there is no way of determining the actual yield of the franchise area. Therefore, since we have nothing with which to compare the statements made and the records produced by the Haitian group, either as to production during 1947 or any time prior thereto, we cannot conclude that those statements and records were false and fraudulent. Accordingly, we are of the

---

[5] Set forth below is that translation:

Whoever by the use of a false name or false qualities or by deceitful practices aimed at conveying the illusion of a real enterprise for a sham one, or power or credit actually nonexistent, or at the creating of hopes or expectations of success or an accident or any chimerical event obtains the handing over of funds, movable property, obligations, dispositions, bills, promises, receipts, or discharges from debts, or their delivery, and who by such means defrauds or attempts to defraud another person of his or her property or part of it shall be punished * * *

opinion that even upon the basis of the testimony of their expert witness petitioners have not established that they suffered a theft loss under the laws of Haiti in 1947 and, consequently, we must sustain respondent's position with respect to this issue.

In passing, it is pertinent to note that petitioners have at no time claimed a deduction on their Federal tax returns for the alleged loss in question. Furthermore, as far as this record is concerned, the corporation is still in existence. Presumably any loss suffered in the instant transaction would be accounted for when petitioners sell or otherwise dispose of their stock in a taxable transaction.

5. *Investment in Farber-Jeter Shipping Company.*—Early in 1947, Valentin Fuente made a loan to the Farber-Jeter Shipping Co., a partnership of which petitioner was a member. The amount of the loan is in controversy. In October 1947 the business was incorporated under the name of Compania de Navigacion Farber-Jeter. That corporation was dissolved in February of 1949, petitioners receiving in dissolution the motor vessel *Bill Phil.*

In his net worth statement, respondent failed to give effect to the Fuente loan and the corporate dissolution, computing petitioners' investment in Farber-Jeter at $42,022.75 as of December 31, 1947, 1948, and 1949. Now, on brief, he acknowledges the Farber-Jeter investment should be reduced by one-half the amount of the Fuente loan, and further acknowledges that petitioners sustained a loss upon the dissolution of the corporation measured by the difference between their investment and the value of the property received. However, he maintains the Fuente loan was not greater than $30,000, and is silent on the fair market value of the *Bill Phil* as of the date of dissolution.

On the other hand, petitioners maintain the Fuente loan was at least $30,500, and claim their investment in the business should be reduced by $15,250 and not $15,000 as contended by respondent. With respect to the loss on dissolution, they introduced uncontroverted expert testimony to the effect that the fair market value of the *Bill Phil* as of February 1947 was not more than $12,000.

We sustain petitioners' position on the fair market value of the motor vessel *Bill Phil* without discussion.

In support of their claim that the Fuente loan was at least $30,500, petitioners introduced into evidence, as Exhibit 45–TT, a financial statement of the Farber-Jeter Shipping Co. prepared in 1947 by the company bookkeeper. That statement reflects the Fuente loan at $30,500. The bookkeeper testified that that statement was prepared from information furnished him by petitioner. Petitioners also introduced the deposition of Valentin Fuente which they had originally obtained to establish the existence of the loan. In that deposition

Fuente, when asked the amount of the loan, stated he recalled it was $30,000. Thereafter followed this colloquy between Fuente and petitioners' counsel:

Q. Do you know it wasn't more than thirty thousand?

A. Well, Schultz claims I gave him about $30,500.00, but I only recall about thirty thousand.

Q. Well, do you recall, could it have been more?

A. Oh, yes. Five hundred dollars didn't amount to much, to me, at that time.

In the light of the witness's qualified answers, and the fact that respondent has made no attempt to impeach Exhibit 45–TT, which appears to be reliable, we have resolved this issue in petitioners' favor. Accordingly, we have found as a fact that the Fuente loan was in the amount of $30,500; that petitioners' investment in Farber-Jeter was $26,772.75 as of December 31, 1947 and 1948; and we now conclude that petitioners sustained a capital loss upon the dissolution of the corporation in the amount of $14,772.75.

6. *Nathan loan.*—Petitioners contend that respondent erroneously included in their investments as of December 31, 1949, a loan receivable from Alex Nathan, in the amount of $1,000. Schultz himself testified that Nathan approached him for a loan of $1,000, that he gave Nathan a check in the amount of $1,000 bearing the notation "loan," and that Nathan owed him $1,000 at the end of 1949.

On brief, petitioners refer to Schultz's repeated unsuccessful efforts to collect from Nathan and the latter's contention that the amount was paid to him as a commission rather than as a loan. They state:

To say the least, the item is in dispute as to whether or not the $1,000.00 was a loan or a commission, but the fact is that the matter is not in dispute that Petitioner has not been able to collect this sum * * * [from] Alex Nathan on each occasion that he has attempted to make the collection. Petitioners therefore submit that the item of $1,000.00 should therefore be excluded.

Plainly, as we have found, the transaction must be treated as a loan, and if petitioners are to succeed in having this item eliminated from their 1949 closing net worth, such result can be achieved only by a finding that the debt became worthless before the end of that year. But such finding cannot be made on this record.

Assuming all the facts relied upon by petitioners to be true, this record falls far short of establishing the worthlessness of the Nathan loan during 1949. We do not know from the evidence whether Nathan made any refusal to pay prior to the close of 1949. Moreover, even assuming that he did, the mere demand and refusal to pay a debt is insufficient evidence of its worthlessness. *Walter J. Runyon*, 8 T. C. 350. No other evidence establishing worthlessness has been presented for our consideration. The respondent is sustained on this issue.

7. *Nontaxable portion of capital gains.*—Petitioners next contend that respondent erroneously failed to reduce their annual net worth for each of the years in issue by the nontaxable portion of any capital gains realized by them in the year immediately *preceding* each of the years under consideration. Thus, they state their argument on brief:

unless the non-taxable portion of the capital gains is excluded in subsequent years * * * those non-taxable portions will show in one of three places, as follows:

    1. Investments or other assets * * *
    2. Cash in the bank.
    3. A non-deductible expenditure.

* * * It is unfair to petitioners to exclude the non-taxable portion of the capital gain during the year in which the gain took place and then to include it in the subsequent year in computing net worth thereby taxing [it] and showing [it] as income * * *

The short answer to this is that petitioners' position is based upon a misunderstanding of the net worth method. Under the net worth method a taxpayer's net income is computed, first, by determining the *increase* in net worth for a particular year. To such increase there must then be added all nondeductible expenditures (e. g., living expenses) made by the taxpayer during the year, for such expenditures are evidence of additional taxable net income realized during the year. However, there must also be a downward revision to reflect any nontaxable receipts (such as gifts, life insurance proceeds, etc.) as well as the nontaxable portion of any capital gains, for such increments to the taxpayer's assets are reflected in the increase of his net worth during the taxable year, and since they are nontaxable they must be subtracted in order to ascertain the taxable net income for the year in question. But once they are subtracted for that year that is the end of the matter. For the following year we must begin with the assets which the taxpayer then has on hand to determine to what extent there has been an increase in net worth as of the end of that year that is attributable to the realization of taxable net income during such year. In making that determination, adjustments are appropriate with respect to nontaxable receipts, etc., applicable to that year; but it would be wholly inappropriate, and indeed it would result in effect in double deductions, if the adjustments made for the previous year were made a second time, as urged by petitioners. There is no merit to their contention.

8. *Fraud.*—The last issue for consideration is whether any part of the deficiencies of David H. Schultz for the years 1946 and 1947, and of the petitioners for the years 1948 and 1949, was due to fraud with intent to evade tax. The burden with respect to this issue is on respondent and must be satisfied by clear and convincing evidence. Direct proof of fraud is seldom possible. Rather, it usually is shown

from the transactions under consideration and the taxpayer's conduct with respect thereto. *M. Rea Gano*, 19 B. T. A. 518. On the record, we are satisfied that respondent has met his burden with respect to the years in issue.

At the outset we note that petitioners, by virtue of their present positions, in effect concede understatements of net income in the amounts of $19,232.84 and $66,582.16 for the years 1948 and 1949, respectively. That is so because they accept the correctness of the net worth statement with respect to all of the items except the issues discussed above. For the year 1946 their position is in substance that they received net income of at least $42,075.23 while reporting only $11,488.94. Since their returns for that year were filed on a community property basis, petitioner David H. Schultz may be charged with one-half of that conceded understatement. Hence, we are faced with virtually conceded understatements for each of the years 1946, 1948, and 1949. Of itself, such circumstances are strong evidence of fraud. Cf. *Abraham Galant*, 26 T. C. 354. Such a consistent pattern of under reporting large amounts of income is further evidence of fraud. *Holland* v. *United States*, 348 U. S. 121; *Rogers* v. *Commissioner*, 111 F. 2d 987 (C. A. 6), affirming 38 B. T. A. 16; *Louis Halle*, 7 T. C. 245, affirmed 175 F. 2d 500 (C. A. 2), certiorari denied 338 U. S. 949.

In addition to the consistent pattern of understatements, there are present other recognized badges of fraud in this record. With respect to the taxable year 1946, petitioner admits that no part of the $21,408.36 paid David H. Schultz and Company, representing banana sales in excess of prevailing O. P. A. ceiling prices, ever found its way on the books of that enterprise, or on his individual Federal income tax return for that year. No attempt has been made to show what, if any, portion of those unreported receipts represented costs paid for bananas purchased by petitioner in excess of ceiling prices. The argument that the deception was practiced only upon the Office of Price Administration is unavailing. *Jack M. Chesbro*, 21 T. C. 123, 130, affirmed 225 F. 2d 674 (C. A. 2), certiorari denied 350 U. S. 995. In addition, petitioner entered a plea of guilty to a criminal charge of willfully attempting to evade the Federal income tax owing by his wife for the calendar year 1946 by filing a false and fraudulent return on her behalf for that year. Since the returns of both petitioners were filed that year on a community basis, and since the only income reported was solely attributable to the efforts of David H. Schultz, that plea is further evidence that his return for 1946 was false and fraudulent.

During the fiscal year ended February 28, 1947, the Roatan Banana Company, a partnership in which petitioner had a one-fourth interest,

was engaged in the business of importing bananas into the United States from Mexico. Whenever Roatan purchased a boatload of bananas in the State of Tabasco, Mexico, the vendors rendered a statement of the transaction reflecting the total sales price paid by the partnership. Upon sale of the fruit in the United States, the partnership prepared a corresponding sales sheet which reflected the total sales price purportedly received for the boatload. A comparison of 68 statements rendered by the vendors with the corresponding sales sheets prepared by the partnership, covering transactions occurring from March 6 through December 29, 1946, revealed that the total sales price set forth on the partnership sales sheets was approximately $256,961.54 less than the total purchase price shown on the vendors' statements. The accountant who prepared the 1947 partnership return testified that he totaled the sales as set forth on the Roatan sales sheets, took 5 per cent of the resulting sum, and entered that figure, $88,555.89, on the return as the partnership's gross receipts and also its net income. Since petitioners have conceded that the partnership never sold bananas in the United States for less than their purchase price in Mexico, it is apparent that the partnership's gross receipts were understated at least to the extent of 5 per cent of $256,961.54. Petitioner returned his community one-half of his distributive share of the partnership net income for 1947 on the basis of 25 per cent of $88,555.89. On brief petitioners concede that the figure appearing on the partnership return was false, but contend that "no consideration was· given * * * [this figure] in connection with the income tax liability of * * * David H. Schultz, insofar as the records purposely made so that they would be acceptable to the OPA authorities." As noted above, that argument has no merit. We are convinced that petitioner received his distributive share of these unreported partnership receipts, see *Paul Masters*, 25 T. C. 1093, affirmed 243 F. 2d 335 (C. A. 3), and are further convinced that he intentionally omitted it from his reported income.

As noted above, petitioners understated their net income for the years 1948 and 1949 in substantial amounts. Moreover, the books and records of the various enterprises in which they had an interest during these 2 years were either incomplete or nonexistent.

In the light of these facts and the record as a whole we are convinced, and have found as a fact, that a part of each of the deficiencies in Docket Nos. 54845 and 54847 for each of the years 1946, 1947, 1948, and 1949 was due to fraud with intent to evade tax.

No issue with respect to the additions to tax under section 294 (d) (1) (B) and (d) (2) has been raised by petitioners, and respondent's determinations with respect thereto are sustained subject to any adjustments necessitated by our disposition of other issues.

*Decisions will be entered under Rule 50.*