Sam Shapolsky and Adele Shapolsky v. Commissioner.
Shapolsky v. Commissioner
Docket Nos. 94043, 4603-67.
United States Tax Court
T.C. Memo 1971-37; 1971 Tax Ct. Memo LEXIS 294; 30 T.C.M. (CCH) 157; T.C.M. (RIA) 71037; February 24, 1971, Filed. Leonard Bailin, 299 Broadway, New York, N. Y., for the petitioners. Agatha Vorsanger and *295 A. Mills McCawley, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: Respondent determined deficiencies in the income taxes of petitioners for the years 1955 through 1958 in the following amounts: Addition to Tax
Year
Deficiency
Sec. 6653(b)
1955
$187,368.46
$93,684.23
1956
152,738.92
76,369.46
1957
46,439.85
23,219.93
1958
11,422.76
5,711.38 The issues for decision are whether petitioners realized income in excess of reported amounts during the taxable years in question and whether petitioners are liable for additions to tax under section 6653(b), Internal Revenue Code of 1954, in any, or all, of these years. Findings of Fact Petitioners, Sam and Adele Shapolsky, husband and wife, filed joint Federal income tax returns for the taxable years 1955 through 1958 with the district director of internal revenue, Brooklyn, New York. At the time of the filing of their petitions in this case, petitioners resided in Woodmere, New York. Sam Shapolsky will sometimes hereinafter be referred to as petitioner. Petitioner was born in 1911. His formal education consisted of 8 years of instruction *296 in elementary school, after which, at the age of 14, he accepted employment in a factory as errand boy. Thereafter, petitioner and his father acquired a 5 and 10 cent store which they owned and operated until 1945. In 1945 petitioner obtained employment at a small liquor store and in 1948 acquired a 50 percent partnership interest therein for $5,000. Four years later petitioner sold his partnership interest in the store for approximately $15,000. Between 1943 and 1952 petitioner also participated as broker, although unlicensed as a broker at that time, in several real estate transactions involving property in which petitioner either acquired or owned an interest. Following the sale of his interest in the liquor store in 1952, petitioner joined his brothers Harry and Martin Shapolsky in the real estate business. The former, born in 1910, was one year older than petitioner and had a similar educational background. He left school at age 14 to become an apprentice electrician and at 21 obtained a license to practice this vocation. Harry first entered the real estate business in 1934, at which time he commenced purchasing small parcels of real estate in need of maintenance and retaining *297 or selling the property after making the necessary repairs. By 1952 Harry's real estate holdings, which had steadily grown over the years, were quite substantial. At that time Harry possessed stock interests ranging from 25 percent to 100 percent in numerous corporations, owning in the aggregate between 100 and 200 parcels of real estate at a given time. Prior to 1952 petitioner did not possess an interest in any of Harry's corporations although in some cases third party investors possessed significant stock interest in the corporations. Harry was the sole owner of most of the corporations in 1952. The buildings were, in the main, tenement 158 houses devoted to residential purposes. In addition to the real estate business, Harry continued to engage in the electrical business through his ownership of the Eagle Electric Company which was in the business of furnishing electrical services, in major portion, to Harry's own corporations. Petitioner's younger brother, Martin, was 20 years his junior. Following the death of their mother, Martin, at age 17, took up residence with his brother Harry, who was single at the time. After completing Stuyvesant High School in New York, Martin *298 attended New York University from 1949 to 1954, as a full-time student, with a major in business administration and a minor in liberal arts. There he enrolled in all courses pertaining to real estate. He did not receive a degree however since he was several points short of the requirements for graduation at the time he left college. While attending the university, Martin was also employed by his brother Harry, assisting him on a part-time basis in the management of his extensive real estate holdings. In 1954 Martin was married and moved to a separate residence. Several years later Harry also was married. In 1952 petitioner and Martin, largely at the urging of their brother Harry, formed a partnership named Eagle Realty Associates (hereinafter referred to as Eagle Realty) for the purpose of conducting a real estate management and brokerage business. A "Business Certificate for Parthers" naming Meyer [1] and Sam Shapolsky as partners, was issued on November 24, 1952. Petitioner acquired a license as a real estate broker sometime in 1952 and was licensed in this capacity during the taxable period in question. Martin was also a licensed real estate broker during this period. Eagle Realty *299 filed its tax returns on a calendar year basis and cash method of accounting. Its Federal partnership returns were filed with the district director of internal revenue, Manhattan, New York. As a real estate management and brokerage company, Eagle Realty serviced primarily the requirements of corporations owned, in part, by one or more of the Shapolsky brothers. Approximately 80 percent of its accounts consisted of real estate owned directly or indirectly (through the possession of stock) by Harry Shapolsky, the balance representing real estate controlled by unrelated parties. By the same token, most of Harry's management and brokerage needs were furnished by Eagle Realty. Offices, located at 608 E. 11th Street, New York City, in a building owned in part by Harry and Sam, served as the business headquarters of the Shapolskys for all activities connected with the ownership of real estate, including the operation of Eagle Realty. The offices consisted of 10 rooms covering an area approximately 25 by 100 feet in size. Books and records which were not in current use were stored in the basement of the one-story *300 building. The offices were occupied by Harry, Martin, and petitioner. Petitioner generally arrived for work at 10:00 A.M. and departed at 4:00 P.M., five days each week. Harry spent considerably more time at the office. By the terms of an unwritten understanding between the brothers, each partner in Eagle Realty was entitled to an equal share of its profits. Business activities of the partnership were divided among the partners in accordance with the particular skills of each partner. Petitioner served the partnership primarily as a broker. Martin, having received many years of management experience prior to the formation of Eagle Realty, handled the management end of the partnership activities. Harry, as owner of most of the subject real estate, however, dominated the business activities and exercised firm supervision over the partnership business. The division of labor described above was not always clearly defined. Although Martin generally handled matters related to management while present at the office, petitioner collected rents, made appropriate bookkeeping entries, and prepared deposits while Martin was away. For an approximate two-year period ending March 7, 1957, during *301 which Martin served in the armed forces, petitioner's partnership duties included the management activities, otherwise handled by Martin. Petitioner, lacking competence in this area, received assistance in management from Harry, who was familiar with all aspects of the business. During this period, in addition to management activities enumerated above, petitioner signed most, if not all, the checks of Eagle Realty. The accountant generally consulted with Harry rather than with Sam in connection with problems which arose while Martin was in the army. At all times petitioner 159 supervised the renovation of certain buildings and assisted in the finding of tenants. Thus, he was familiar with all aspects of the partnership's business activities. The management activities of Eagle Realty involved generally the rental of vacant apartments, collection of rents, and maintenance of the property in proper repair. Rental receipts were entered, as received, in "rent books" containing a record of the month, year, and amount of rentals collected with respect to each building managed by Eagle Realty. A deposit slip was prepared each day and the sums collected during the day were deposited in *302 a bank account. Approximately 90 percent of the total rental receipts was deposited in this manner. The balance was turned over to Harry who disposed of it as he chose. Disbursements on account of repairs or other expenses were not recorded in ledger form. The only record of such payments was provided by notations on the check stubs, where the purpose and payee of a particular expenditure were sometimes but not always reflected. At the end of each month either Harry or the bookkeeper reconciled the account by checking the stubs against the bank statement. Eagle Realty received compensation for its management services in the form of commissions. The commissions were generally in an amount determined by Harry, as described below. Eagle Realty received commissions with respect to all properties it managed. Eagle Realty maintained two checking accounts during the taxable period in question, one at Manufacturers Trust Company (hereinafter referred to as Manufacturers) and a second at Trade Bank and Trust Company (hereinafter referred to as Trade). These were but two of numerous bank accounts involved in the operation of the real estate business by the Shapolsky brothers. Generally, *303 each real estate corporation maintained a separate bank account in its own name. The Manufacturers account was opened by Eagle Realty on February 1, 1954, and was closed following Sam's departure from the partnership in 1960. The authorized signators of this account were Sam and Martin, each of whose signatures was sufficient. The Trade account was opened on January 6, 1953, and was closed on April 18, 1962. However, the latter account was reopened on May 8, 1962. The signators of this account during the period in question were Sam and Meyer Shapolsky. [2] *304 Contending that petitioner did not contribute toward the purchase of real estate by any of the above-named corporations, Harry denies that petitioner possessed any interest in all but five of the corporations. With respect to the five concededly owned in part by petitioner, Harry maintains that petitioner received his interest as a gift from 162 him but furnished no consideration. [3] The five corporations referred to and the approximate percentage of Sam's ownership admitted by Harry are as follows: Corporation
Sam's Interest
640 E. 13th Street
25% or 33 1/3%
117 Realty Corp.
33 1/3%
8th Realty Estates
25% or 33 1/3%
Rubah Realty Corp.
25%
Willet Street Realty Corp.
25%
On his Federal income tax return for the years 1955 through 1958, petitioner reported income in the following amounts from the sources indicated: 1955
1956
1957
1958
Wages:
428 Realty Corp.
$2,500.00
$ 4,550.00
$ 400.00
$ 4,000.00
Marsam Brokers, Inc.
3,900.00
5,200.00
5,200.00
5,200.00
E. 47 Realty Corp.
1,000.00
1,550.00
300.00
Surenko Realties
2,500.00
2,300.00
2,600.00
Callipari Const. Corp.
900.00
900.00
1,000.00
640 E. 13th St. Corp.
2,500.00
277 4th Realty
1,850.00
1,300.00
3,900.00
28 W. 132 Corp.
250.00
299 3rd Corp.
750.00
Total
$7,400.00
$19,050.00
$10,650.00
$17,450.00
Other Income:
Interest from mortgages
$ 275.00
$ 250.00
$ 2,373.56
$ 2,085.80
Distribution from partnership - Eagle Realty
304.47
987.94
6,424.09
18,294.38
Gain from the sale of capital assets
[4] 15,283.00
Total income
$7,979.47
$20,287.94
$19,447.65
$53,113.18
*305 The acquisition of real estate by the Shapolsky brothers required substantial sums of capital. The rental collections of Eagle Realty, deposited in the Manufacturers account, provided a ready source of funds. These funds were utilized at will by Harry and his brothers, at least to the extent of the portion attributable to corporations in which they owned an interest, to finance numerous real estate acquisitions. Petitioner's allegations in the State court action that he furnished capital for the acquisition of real estate was predicated, for the most part, precisely upon this use of the Eagle Realty funds, which funds he claimed were owned by all three brothers equally. Occasionally the transactions were disguised so as to give the appearance that the investment funds were being supplied by Martin, *306 rather than Eagle Realty. This was accomplished by having Martin issue his personal check in the amount needed and later repaying him from rental receipts of the property purchased. The Shapolskys found it necessary to distort the transaction in this manner because Eagle Realty was in form merely a management company which held the funds in trust for its corporate clients. Nevertheless, as a result of the common ownership of Eagle Realty and the majority of corporate clients, the Shapolskys frequently treated the escrow funds of Eagle Realty as their own. In some cases the corporations controlled by one or more of the Shapolskys themselves purchased additional real estate out of their surplus funds. For the same years Eagle Realty filed Federal partnership returns reporting income in the following amounts: 1955
1956
1957
1958
Management gross income
$14,654.50
$18,242.32
$26,806.80
$52,607.95
Deductions 14,045.56
16,266.44
13,958.62
16,019.19
Net Profit
$ 608.94
$ 1,975.88
$12,848.18
$36,588.76
Partners' shares of partnership income Sam
$ 304.47
$ 987.94
$ 6,424.09
$18,294.38
Martin
304.47
987.94
6,424.09
18,294.38 163
*307 The salary income reported on petitioner's income tax returns generally represented payment for services performed by petitioner in connection with the renovation of properties managed by Eagle Realty. Such services consisted of supervising the renovation and securing tenants to occupy the building following the completion of renovation. Petitioner owned a number of mortgages during the taxable period in question from which he derived a portion of his reported interest. Eagle Realty experienced a growth of income during 1957 and 1958 resulting from an increase of brokerage transactions in those years. This increase was attributable to the sale by a real estate partner of Harry of a major portion of his real estate holdings. Eagle Realty acted as broker in the majority of these sale transactions. Most of the brokerage commissions reported as income by petitioner involved real estate in which Harry had an interest. Such income was generally deposited in the Trade account and was shared equally by Martin and petitioner, along with management commissions also deposited in this account. Petitioner's income tax returns were prepared by an accountant solely upon the basis of his analysis *308 of the Trade account and additional information furnished by petitioner. During the period in question, Eagle Realty engaged the services of at least two accountants. Isadore Roseman, a registered public accountant, who worked full-time as an employee of New York State, visited the offices of Eagle Realty approximately once a week for the purpose of rendering accounting services with respect to the Trade account of Eagle Realty and several corporations in which Sam possessed an interest. Roseman did not handle the Manufacturers account except upon one occasion in 1955 when he was specifically commissioned by Harry to audit the records of the Manufacturers account. The purpose of this audit was to locate the source of a discrepancy in that account involving the disappearance of some $5,000. Roseman had been petitioner's accountant prior to the formation of Eagle Realty, having performed services for petitioner's liquor business. Roseman's duties at Eagle Realty included the preparation of books of account and partnership income tax returns. In preparing the books of account for Eagle Realty, he ascertained the receipts from passbooks or bank statements of the Trade account and disbursements *309 from checkbook stubs where the necessary information was noted and otherwise from the explanations furnished by one of the Shapolsky brothers. Roseman also prepared individual returns for Martin and petitioner for 1955 and subsequent years. The figure for total wages which appears in these returns was derived from W-2 forms provided to Roseman. The amount of interest income reported was furnished to him by the individuals. In working for Eagle Realty, Roseman generally received his instructions from Harry. A second accountant by the name of Cohen handled the books of the Manufacturers account, as well as the majority of the corporate accounts. Roseman did not perform services with respect to any corporation in which petitioner did not possess an interest. For several years after petitioner's departure from Eagle Realty, its business continued to function in much the same manner as it had prior thereto. Certain bookkeeping changes resulted from the elimination of the master account at Manufacturers, but the business operations remained the same. Sam received no income from Eagle Realty after leaving the partnership nor did he participate in business activities of Eagle Realty after *310 1960. However, Roseman continued to serve as accountant until 1962 or 1963, generally performing the same duties as before. Martin continued in the business with his brother Harry until 1967, at which time he left. He was prompted to leave by the realization that, despite contrary assurance from Harry, he had gained interests in very few properties managed by Eagle Realty. In conjunction with the real estate business described above, petitioner and Martin conducted an insurance brokerage business named Marsam Brokers, servicing chiefly corporations in which Harry had an interest. Martin, a licensed insurance broker, was the active member of this partnership. Petitioner lacked an insurance broker's license and performed little or no services for the partnership. Nevertheless, pursuant to an understanding between them, petitioner and Martin shared equally in the profits of the partnership. Following petitioner's separation from his brothers in 1960, the insurance business continued to function under the name Marsam Brokers. Petitioner was replaced in the partnership by Harry's wife. Respondent commenced his investigation of the business affairs of petitioner during 1957. The investigation *311 was conducted in 164 its initial stages by revenue agent Joseph Kissane. On November 24, 1958, the matter was referred to special agent Victor Fisher for more intensive investigation. In the course of this investigation, during February 1959, Fisher requested petitioner to provide him with the records of the Manufacturers account for inspection. Petitioner expressed his willingness to do so but advised Fisher that the records were then in the custody of the district attorney's office in connection with an investigation being conducted by that office. The district attorney's office, however, when asked for petitioner's business records, refused to turn them over to Fisher without the written authorization of petitioner. Petitioner, at the advice of counsel, declined to furnish any such authorization. Although Fisher could easily have secured the sought-after records by means of an appropriate summons, he did not do so. The investigation continued for many years encompassing every aspect of the businesses conducted by the Shapolskys. Recognizing the importance of the Manufacturers account in the ongoing investigation, sometime after the start of the investigation Harry personally *312 went through the accumulation of cancelled checks stored in the basement and removed therefrom all such checks which he desired to conceal from respondent. By stipulation, petitioner has conceded the following items: (1) Eagle Realty realized unreported income in the years 1956 and 1957 from unexplained deposits in the Trade account in the sums of $1,603.20 and $2,512.69, respectively; (2) Expenses claimed as a deduction by Eagle Realty for the years 1955 through 1958, in the amounts of $3,801.78, $5,135.16, $7,280.00, and $6,174.37, respectively, were properly disallowed; (3) Eagle Realty failed to include in income for the years 1955 through 1958 specific receipts in the amounts of $3,750.00, $13,875.00, $3,150.00, and $1,000.00, respectively; (4) Depreciation in the amount of $1,000.00 for the year 1957 and the claimed reductions of Eagle Realty's income in the amounts of $3,641.00 and $5,843.75 for the years 1957 and 1958 were properly disallowed; (5) Petitioner's share of the increase in partnership income resulting from the above adjustments shall be one-third; (6) Petitioner received additional interest income in the years 1955 through 1958 in the amounts of $3,019.14, *313 $3,333.23, $82.00, and $154.00, respectively; (7) Petitioner received additional interest income in 1955 and 1956 of $52.96 and $41.14, respectively; [5] and (8) Petitioner received amortization income in the amount of $1,075.59 in each of the years 1957 and 1958 and realized a capital gain in the amount of $4,500.00 in the year 1958. Petitioners maintained a bank account in the name of Adele Shapolsky at the Meadowbrook National Bank. A total of $17,859.53 was deposited in such account during 1956. Of this amount respondent concedes that the deposits of $1,575.00 and $5,504.53 were from nontaxable sources. Opinion Respondent has asserted sizeable deficiencies in the income tax of petitioner for each of the taxable years 1955 through 1958, inclusive. These deficiencies result primarily from respondent's determination that bank deposits to the Manufacturers account of Eagle Realty, in excess of offsetting expenditures substantiated by cancelled checks or other reliable evidence, constituted income to the partnership. Thus, *314 of total deposits in the amounts of $872,563.52, $531,660.40, $429,775.40, and $194,473.71, respectively, during the taxable years in question, $351,694.59, $73,378.68, $167,482.56, and $17,310.14, respectively, were treated as income to Eagle Realty. Petitioner's distributive share of the additional partnership income resulting from the above determination, in turn, comprises the bulk of petitioner's deficiencies during the taxable period in question. The method employed by respondent in computing the deficiencies of petitioner, although referred to by respondent as the bank deposits and cash expenditures method, should not be confused with the more common application of this method. Recourse to the bank deposits method often becomes necessary where a taxpayer, in disregard of the requirements of the Internal Revenue Code to do so, has failed to maintain 165 reasonably accurate records of his business activities. See sections 446 and 6001 and the regulations thereunder. In such cases the Commissioner may justifiably resort to the bank deposits of the individual during the taxable year, *315 or other indirect method, as a measure of his income. Epstein v. United States, 246 F. 2d 563 (C.A. 6, 1957), certiorari denied 355 U.S. 868 (1957); Maroosis v. Smyth, 187 F. 2d 228 (C.A. 9, 1951); cf. Holland v. United States, 348 U.S. 121 (1954). The bank deposits method is founded upon a presumption that deposits in the taxpayer's bank accounts, as well as his cash expenditures during the taxable year, were derived from taxable sources and produced in the same year. While the true facts may fail to bear out this presumption, the burden of refuting it rests upon the taxpayer who has failed to maintain the requisite records from which the amount of his reported income could otherwise be verified. In the present factual setting, however, no such presumption concerning the taxable nature of the deposits is necessary. The undisputed source of these deposits, consisting of rental collections from the many parcels of real estate managed by the partnership, is admittedly of a taxable character. Thus, the burden of establishing the propriety of any claimed reductions in income as a result of expenses incurred in producing the income *316 of distributions of the rental proceeds to the various corporate owners of the real estate, falls squarely upon the shoulders of petitioner. The obligation to do so in the present case is no different from that generally faced by taxpayers particularly where the taxable receipts, in the amounts stated above, have been conceded by petitioner. Rule 32, Rules of Practice, United States Tax Court; Welch v. Helvering, 290 U.S. 111 (1933). Accordingly, we are forced to conclude that except to the extent petitioner has furnished competent evidence of the available reductions in income, petitioner's share of the bank deposits to the Manufacturers account constituted income to him during the taxable years in question. In opposition to the proposed deficiency, petitioner alleges that the full amount to the Manufacturers deposits was disbursed or distributed before the end of each month. The majority of funds, according to petitioner, were distributed to those legally entitled thereto, namely, the owners of the real estate. The balance, he continues, was either transferred to the Eagle Realty Trade account as commissions for the performance of management services or utilized for *317 payment of repairs and maintenance expenses in connection with the management of the realty. As reflected in our findings, we consider these but idle assertions. The most cursory examination of the record before us reveals, at once, the complete absence of supporting evidence. Not only is the record devoid of evidence sufficient to sustain the petitioner's burden of proof, it in fact warrants a contrary conclusion. The evidence herein offered by petitioner consists almost exclusively of the testimony of four witnesses - petitioner, his accountant Roseman, and his brothers Harry and Martin. Such testimony was uniformly evasive and general in character, not to mention its patent incredulity in many instances. Quite apart from the evidentiary value of the testimony, however, such testimony simply does not support the factual allegations of petitioner. We have found, on the basis of the evidence presented, that Eagle Realty's funds were utilized freely by the Shapolsky brothers to finance numerous investments in real estate during the period in question. Petitioner, himself, has all but admitted this detrimental fact in the course of his testimony. Such was also the testimony of Martin. *318 More importantly, there is nothing in the record to negate the possibility that the funds were diverted by petitioner for his personal use. While petitioner and Martin have both testified otherwise, as already mentioned, we have found their testimony unworthy of belief. Furthermore, we consider petitioner's uncorroborated allegations of little value. In the circumstances of the present case, petitioner's failure to produce the books and records of Eagle Realty without adequate explanation is fatal to his contest of the deficiency. In an effort to justify such inaction, petitioner has indicated that the records were in the dominion of his brother Harry and hence unavailable to him for presentation to the Court at trial. He further intimates that certain portions of the records, which Harry considered potentially prejudicial to his interests, were either concealed or destroyed by Harry during the progress of the investigation so as to avoid their examination by respondent's agents. We find petitioner's explanations more detrimental than beneficial to his cause. In the first place, it appears reasonable to assume on the basis of these assertions that the likely effect of producing the *319 missing records 166 would have been to implicate petitioner, as much as Harry, for the personal use of the trust funds of Eagle Realty. Secondly, the record discloses that both Martin and petitioner's accountant, Roseman, witnessed Harry's allegedly illicit activity. We think it not improbable that petitioner also knew of Harry's improper conduct but, failing to take any action, acquiesced therein. Moreover, the record does not demonstrate any earnest effort by petitioner to secure the records of Eagle Realty from Harry. Although petitioner did cause a subpoena to be issued requiring Harry to produce the records of Eagle Realty in his possession, petitioner never, in fact, requested those records at trial. While it is possible that Harry did not bring the requested documents, such matters should not be left to conjecture. Even assuming petitioner's excuse for his failure to produce the crucial records of Eagle Realty was valid, petitioner has made no effort to compensate for their absence by detailed testimony concerning the contents of those records. The failure of petitioner to offer the testimony of such knowledgeable individuals as Cohen, the accountant in charge of the books *320 of the Manufacturers account, or of the bookkeeper, can only result in a negative inference detrimental to the interests of petitioner. Additionally, the records of the real estate corporations may have provided some documentary evidence to support petitioner's bare allegations, yet no such records were presented. In short, the explanations of petitioner must be dismissed as highly unsatisfactory. We thus consider petitioner's failure to substantiate his bare allegations by competent evidence as a most transparent indication of their lack of merit. As regards the question of the credibility of petitioner and other witnesses testifying on his behalf, the record speaks for itself. Comments of the Court during the course of trial reflect our contemporaneous dissatisfaction with the credibility of these witnesses. Further leisurely scrutiny of the record serves to reinforce our initial impressions. We have no doubt of petitioner's clearly manifested intention to conceal the facts of this case. This he hoped to accomplish by being evasive in his responses and, all too often, by overt misrepresentation. Unfortunately, such tactics can be of no aid where petitioner bears the burden of proof. *321 Petitioner's careful avoidance of details plainly deprived his testimony of any vitality. Further, his exhibition of ignorance was utterly unbelievable and supports the inference that the unrevealed knowledge within his possession would have been detrimental to his case. Petitioner's professed ignorance is, in point of fact, refuted by his rather detailed testimony several years before the trial herein in the State court action between petitioner and Harry. Finally, the record is replete with incongruities and contradictions in the testimony of petitioner and the other witnesses, a detailed enumeration of which is unecessary. An illustration of this conduct may be found in the initial claim by petitioner that he possessed an interest in approximately 10 parcels of real estate whereas, in truth, petitioner acknowledged upon cross-examination his claimed interest in 24 corporation, each of which owned one or more properties. Similarly, petitioner testified that he never received funds from Eagle Realty's Manufacturers account only to later modify his testimony when confronted by the sworn statement of his prior litigation that the funds were frequently used to purchase real estate *322 on behalf of the Shapolsky brothers. These and numerous like incidents betray petitioner's reluctance to reveal the true facts. Accordingly, we regard the testimony of all four witnesses as unreliable and have accorded little, if any, weight to the self-serving features of such testimony. Having considered the evidentiary aspects of the case in some detail, we turn to the factual intricacies presented by the continuing litigation between petitioner and Harry concerning the true ownership of the various corporations whose property was managed by Eagle Realty. The relevancy of this question to the present issue is immediately apparent since it is the conceded use of Eagle Realty's funds by the Shapolsky brothers that furnishes the strongest affirmative evidence of their diversion of its funds for individual needs. We have already noted the testimonial admissions of petitioner relating to the frequent use of rental receipts for investment purposes. Such liberties taken with funds technically belonging to the owners of the real estate managed by Eagle Realty were attributable to the overlapping ownership of Eagle Realty and approximately 80 percent of the real estate corporations by *323 one or more of the Shapolsky brothers. The informal relationship between stockholders and their closely-held corporations, 167 illustrated by the conduct of the Shapolskys in this case, is not unusual. However, the interception of corporate funds at an early stage does not alter the nature of the receipt. It is regarded, in legal effect, as a distribution of the funds to the corporation followed by the payment of a dividend to the shareholder. Such a result is dictated by economic realities. See Blue Flame Gas Co., 54 T.C. 584, 596 (1970); and George R. Tollefson, 52 T.C. 671, 681 (1969), affd. 431 F. 2d 511 (C.A. 2, 1970). The controversy between petitioner and Harry regarding the ownership of the corporations named as defendants in the State court proceeding stems from their divergent interpretations of the use of Eagle Realty's funds in purchasing the disputed real estate. As we are able to ascertain petitioner's position in the State court proceeding from a rather meager record, petitioner entertains the view that the utilization of Eagle *324 Realty's funds amounted to the equal participation of all three brothers in the acquisitions since the funds were purportedly owned by all equally. Harry of course takes a contrary position. He apparently maintains that the funds belong to the existing corporations and hence the benefits of their use as investment capital inured to the shareholders of such corporations. Since Harry, rather than Sam, was the shareholder of these corporations in 1952, it follows from Harry's reasoning that the contributions of the partnership funds to the corporations created after 1952 were those of Harry. In effect, the interception of the corporate funds by Harry would, as described above, amount to the distribution of a dividend to him. It would seem to follow from the latter view, and petitioner so intimates, that no income resulted to petitioner from the diversion of the partnership funds to the newly created corporations. Reduced to simplest terms, the guestion of whether petitioner realized income by virtue of the use of Eagle Realty's funds in the acquisition of real estate would seem to depend upon the extent to which he acquired an interest in the properties acquired. The ultimate resolution *325 of the ownership question, in turn, hinges upon the outcome of the State court proceeding. A decision in the State litigation, however, is unnecessary for our determination in the instant proceeding. It must be assumed, for purposes of this case, that petitioner did acquire an interest in some portion of the corporations. Petitioner has done nothing more than imply that he did not. The crucial facts have been left to conjecture and speculation. Notice must also be taken of the conflicting positions taken by petitioner in the current and the State court litigation. In the face of his emphatic allegations in other proceedings and sworn testimony in support thereof, we can only conclude that petitioner did gain interests in the corporations by virtue of the joint use of the partnership funds in financing the corporate real estate ventures. Petitioner furnishes us with no contrary evidence. More importantly, whether or not the use of Eagle Realty's funds inured to the benefit of petitioner, he must nevertheless be charged with income for the unexplained deposits in the Manufacturers account. This follows from his failure to refute, as we indicated earlier, the respondent's implication *326 that such funds were diverted in part or whole to his personal benefit. The possibility of such diversion is apparent in view of petitioner's inability to establish any other disposition of these funds. For reasons heretofore stated we are constrained to uphold the deficiency asserted in each of the taxable years at issue. The next issue presented is whether petitioner is liable for the payment of a 50 percent addition to tax for fraud under section 6653(b). In contrast to the prior issue, the burden of proof in connection with the imposition of a fraud penalty rests upon the respondent, who must establish the existence of fraud by clear and convincing evidence. Section 7454(a); Helvering v. Mitchell, 303 U.S. 391 (1938); Arlette Coat Co., 14 T.C. 751 (1950). Once respondent has established the existence of fraud with respect to some portion of the deficiency the penalty is then applied to the full amount of the deficiency. W.A. Shaw, 27 T.C. 561 (1956), affd. 252 F. 2d 681 (C.A. 6, 1958). In the instant case, respondent places primary *327 reliance upon the stipulated omissions of income by petitioner during each of the taxable years. In addition, respondent cites, among other things, the vast deficiencies asserted in the sequence of years before us, the alleged failure of petitioner to cooperate in the investigation and the failure to maintain a proper set of books and records, as factors from which 168 the presence of fraud may be inferred. The issue of fraud is principally factual and depends upon the circumstances of each case. The term "fraud" means actual intentional wrongdoing and the intent required is the specific purpose to evade the payment of taxes believed to be owing. Fraud also implies bad faith and a sinister motive. 10 Mertens Law of Federal Income Taxation, sec. 55.10. It is, therefore, clear the mere omission of income does not, per se, establish the existence of fraud. David H. Schultz, 30 T.C. 256 (1958), reversed and remanded on other grounds 278 F. 2d 927 (C.A. 5, 1960). See also Holland v. United States, supra, at 139. Nor does the assertion of a deficiency *328 for a series of consecutive years, albeit sustained for failure of the taxpayer to satisfy his burden of proof, justify the imposition of a fraud penalty. On the other hand, because of the mental ingredient inherent to the finding of fraud, rarely can such a finding be supported by direct evidence. Thus, it has been held that the presence of a fraudulent state of mind may be inferred from the conduct of an individual, such as "evidence of a consistent pattern of underreporting large amounts of income, and of the failure on petitioners' part to include all of their income in their books and records," under a particular set of circumstances. Holland v. United States, supra, at 139. In the present case there is no question that petitioner did substantially understate his income in each of the taxable years at issue. This fact has been stipulated by the parties. Thus, it is solely the requisite fraudulent intent which remains to be proven by respondent. The stipulated omissions of income and overstatements of deductions have been set forth in our findings. Many of these items such *329 as interest received on mortgages, bank interest and specific receipts are clearly of a taxable nature. We have no doubt, on the basis of our appraisal of petitioner's intellect and business acumen, that he was well aware of the taxable nature of these items. While an omission of income may sometimes be attributable to negligence, gross negligence, or a bona fide mistake of law, we think petitioner's consistent failure to report items of a clearly taxable character over a period of years, when considered together with the record as a whole, amply demonstrates the existence of fraud. We recognize that certain items included in the stipulation, in the absence of evidence as to the circumstances surrounding these understatements, may be equally consistent with a mental state other than an intention to evade the payment of tax. Included in this category are, for example, the capital gain, amortization income, and depreciation, each of which could conceivably have resulted from a misconception of law or from gross negligence. The respondent's failure to introduce evidence with respect to these stipulated items has measurably detracted from the impact of the stipulation as evidence of fraud. *330 Nevertheless, the omission of other items mentioned above can, in our opinion, support only an inference of fraud. Therefore, we have concluded that respondent has sustained, by a clear and convincing showing, the imposition of a fraud penalty in each of the years before us. Although, as stated earlier, the failure to overcome the presumptive correctness of deficiency with respect to a period of years is not considered evidence of fraud, where the assertion of deficiencies is supported by affirmative evidence establishing the existence of understatements it may contribute to a finding of fraud. Kalil v. Commissioner, 271 F. 2d 550 (C.A. 5, 1959), affirming a Memorandum Opinion of this Court. In the present case, in addition to the stipulated understatements, the record demonstrates the existence of unexplained bank deposits of substantial magnitude to the Manufacturers account of Eagle Realty, during each of the taxable years. These items were produced from admittedly taxable sources, and to the extent petitioner has failed to substantiate claimed reductions of income, have *331 already been held to constitute income. We have also emphasized petitioner's testimony, elicited during cross-examination, regarding his use of the partnership funds for investment purposes. In view of petitioner's failure to report large sums of taxable receipts, as well as his conceded use of the funds for individual purposes, the deficiencies herein do provide additional support for the imposition of a fraud penalty. While respondent has not affirmatively established the precise amount of the deficiencies resulting from the bank deposits, substantial understatements have plainly been demonstrated. It is to be particularly borne in mind that, as discussed previously, the acknowledged source of the receipts in the present situation obviates the necessity of a presumption 169 concerning the taxable nature of the deposits. Thus, unlike the assertion of deficiencies in other situations, the method employed herein to determine the deficiencies furnishes some positive evidence of an understatement. Finally, while we must reject many of the claimed indicia of fraud proposed by respondent as unsupported by the record, we do note that *332 the destruction of or failure to maintain records, which factor is present in the instant case, is sometimes regarded as an indication of fraudulent intent. Jacob C. Ehrlich, 31 T.C. 536 (1958); Nathan Goldsmith, 31 T.C. 56 (1958); Jesse Ullman Reaves, 31 T.C. 690 (1958), affd. 295 F. 2d 336 (C.A. 5, 1961). The records maintained by Eagle Realty were skimpy and inaccurate. The failure of the partnership to keep a record of the amounts deposited in the Manufacturers account representing income, it appears, was designed to conceal the receipt of unreported income. As an active member of Eagle Realty and familiar in all respects with its business affairs, petitioner was a party to any fraudulent activity of the partnership. See Herbert Eck, 16 T.C. 511 (1951); Kalil v. Commissioner, supra.Furthermore, the record shows that, in addition to rental receipts, income received as interest on mortgages was deposited in the Manufacturers account. It is particularly noteworthy that in preparing the returns of petitioner, petitioner's accountant, Roseman, did not, nor was he instructed to, examine the Manufacturers *333 account. Petitioner has intimated throughout the current proceeding that his brother Harry, rather than he, is blameworthy for any improper conduct of Eagle Realty. While we have no doubt that Harry did dominate, to a large extent, the business affairs of the Shapolsky brothers during the period 1952 to 1960, and have so found, this fact does not exculpate petitioner, also a capable businessman and an active participant in the partnership affairs, from the consequences of any such impropriety. Kalil v. Commissioner, supra; Herbert Eck, supra.This is especially so where petitioner, not Harry, was one of the two named partners of Eagle Realty. Harry's culpability, which seems especially clear from the record, is not presently before us. Moreover, besides the unreported income of Eagle Realty, large omissions of petitioner's individual income have been stipulated. Accordingly, the additions to tax under section 6653(b), as well as the proposed deficiencies, must be sustained. Decision will be entered under Rule 50. Footnotes
1. It appears that Meyer and Martin Shapolsky are one and the same.↩
2. See footnote 1, supra. The Manufacturers account was regarded generally as an "escrow" account in which most rental receipts were to be deposited. The funds so deposited were utilized for the payment of expenses related to the management of the properties. After subtracting a portion of the balance as commissions, the remaining amounts were theoretically the property of the individual corporations. The allocation of such funds to the owners of the real estate was determined on the basis of rental receipts and expenses attributable to the various buildings managed by Eagle Realty. Checks were generally drawn on the Manufacturers account each month for transmittal to the owners of the real estate or their representatives. However, as described below, Harry and his brothers, having an interest in a majority of the properties managed by Eagle Realty, took liberties with the funds of Eagle Realty, technically belonging to the various corporations owning the real estate. Martin, as the partner chiefly responsible for management of the real estate, was charged with the supervision of the Manufacturers account. Since this account was theoretically an escrow account, the partnership generally followed the practice of disbursing all funds deposited in the account at the end of each month so that the account "balanced to zero." Prior to the formation of Eagle Realty, a bank account in the name of Martin, individually, served a similar function. As in the case of the Manufacturers account, amounts deposited in this account were withdrawn each month. The Trade account was designed to be an "income" account in which commissions received with respect to brokerage and management services were placed for eventual distribution to the partners. No record was kept of the relative amounts of management and brokerage fees deposited in the account. Instead, pursuant to their understanding, the partners of Eagle Realty shared equally all funds deposited in the Trade account. Commissions earned for management services were transferred once each month from the Manufacturers account to the Trade account by depositing a check drawn on the Manufacturers account, in the amount of the commissions, into the Trade account. The size of the commissions varied from one month to another and was determined by Harry, at least with respect to properties in 160 which he possessed an interest. Generally the fees were computed by Harry in amounts charged by unrelated management firms for comparable services. In rough terms, the rate averaged approximately 3 percent of gross rentals. In many cases it was not possible to compute the amount of the commissions on the basis of a specified percentage of gross rentals since the buildings were sometimes vacated to allow for renovation. In such cases, management fees were determined in some other fashion. The majority of checks drawn on the Manufacturers account were made payable to the various corporations owning the real estate as their share of the proceeds of the rental collections. Frenquently Harry promptly cashed these checks from cash rental receipts. He also cashed checks of Eagle Electric Company in the same manner. Checks on the Manufacturers account were generally drawn by Martin, but were occasionally also drawn by Harry, Sam, or the bookkeeper. Checks of Eagle Realty on the Manufacturers account were signed, for the most part, by Martin, when present, and otherwise by petitioner. Both Martin and Sam acceded to requests of Harry with respect to signing or drawing of checks in favor of a particular corporation. Sam signed all checks drawn on the Trade account. While the Manufacturers account theoretically served as escrow for the receipt of rents collected, some nonrental receipts, including returns on mortgages and other income items, were also deposited in this account. Following the departure of Sam from the partnership in 1960, the Manufacturers account was discontinued in favor of the direct deposits of rental collections into the accounts of the various corporations owning the property. This did not effect a change in the business activity of Eagle Realty but amounted to a mere variation in its system of bookkeeping. During the years 1955, 1956, 1957, and 1958 the total amounts deposited in the Manufacturers account were $872,563.52, $531,660.40, $429,775.40, and $194,473.71, respectively. The bulk of these sums consisted of rentals collected by Eagle Realty in those years. Starting with this figure, respondent computed the deficiencies in this case by deducting therefrom any "returns and exchanges" plus the amounts of substantiated expenditures, the deductibility of which were, in his judgment, adequately established. The balance was treated by respondent, in his notices of deficiency, as income to the partnership for each of the years in question. On the basis of cancelled checks made available to respondent, respondent permitted deductions representing alleged expenditures of the partnership in the years 1955 through 1958, as follows: 1955
1956
1957
1958
Total Deposits
$872,563.52
$531,660.40
$429,775.40
$194,473.71
Returns & Exchanges
4,842.61
5,922.45
1,637.50
Returns & Exchanges
4,842.61
5,922.45
1,637.50
Checks Available
568,142.01
508,792.32
338,711.91
191,062.02
Checks Explained
516,026.32
452,359.27
262,292.84
175,526.07 In addition to amounts deducted as adequately explained above, the sum of $91,000 representing nonincome deposits was eliminated from the total deposits. All checks made payable to individuals or corporations related to any of the Shapolsky brothers which were "not reflected on the books and records of the named payee" or for which "records of the named payee [were] not available" were disallowed as a reduction of income. The following amounts, representing available checks made payable to related parties, fall within this category: Not Reflected
on the Books
The Records
and Records
of the Named
of the
Payee Are
Year
Named Payee
Not Available
1955
$ 3,721.03
$ 48,394.66
1956
30,922.06
25,510.99
1957
2,683.64
73,735.43
1958
772.10
14,763.85
Approximately 80 percent of the properties managed by Eagle Realty were owned, in part or whole, by Harry. Petitioner also possessed interests ranging from 16 2/3 percent to 50 percent in some portion of the real estate. The precise number of properties in which petitioner held an interest, 161 however, remains the subject of an unresolved controversy between Harry and Sam, originating with the eviction of Sam from Eagle Realty in 1960. About that time petitioner learned of a purportedly fraudulent effort by Harry to divest him of his interest in various mortgages and properties. Petitioner was so advised by Martin who had become aware of Harry's intentions as a result of his participation in certain insurance adjustments necessitated by Harry's scheme. Upon confronting Harry with this information, petitioner was forcibly dispossessed from the premises of Eagle Realty. At the time of his departure petitioner took with him a small number of checks evidencing the initial transactions related to the formation of several corporations in which he claimed an interest. However, most of the records of Eagle Realty and of the corporations were retained by Harry. Following petitioner's eviction from the Eagle Realty offices, he filed suit in the Supreme Court of the State of New York, naming inter alia Harry and 24 real estate corporations as defendants. His third amended complaint alleged the perpetration of fraud by his brother Harry and requested appropriate relief. More specifically, petitioner claimed partial ownership of 23 corporations, each having title to one or more parcels of real estate. Petitioner was not, however, a shareholder of record in any of these corporations. His claim to ownership was founded upon an alleged oral agreement between petitioner and Harry in 1939, by the terms of which each would contribute equally to the capital of all future real estate acquisitions and become equal shareholders in any corporations formed to hold such property. Petitioner further alleged that he did in fact contribute to the capital of each of the defendant corporations but was fraudulently deprived of his stock in these corporations by Harry who caused all the shares of stock to be issued in his own name. Petitioner's failure to insist upon a written agreement or investigate the actions of his brother was explained in the complaint by the existence of a confidential relationship between Harry and petitioner. The following chart contains the names, approximate years of formation, amounts allegedly contributed by petitioner, and his claimed interest with regard to each of the defendant corporations:
Year of
Amount
Petitioner's
Acquisition or
Contributed by
Claimed
Corporation
Formation
Petitioner
Interest
88 Hopkins Street Corp.
1939
$ 1,250.00
25%
Surenko Realties, Inc.
1942
500.00
50%
428 Realty Corp.
1952
3,500.00
50%
640 E. 13th St. Corp.
1953
2,200.00
33 1/3%
E. 47 Realty Corp.
1953
5,500.00
50%
117 Realty Corp.
1954
833.33
33 1/3%
Eighth Realty Estate, Inc.
1954
5,500.00
33 1/3%
102 West 115th St. Realty Corp.
1955
2,100.00
20%
227 E. 127th Street Corp.
1955
2,500.00
50%
194 Avenue A Realty Corp.
1955
200.00
50%
Rubah Realty Corp.
1955
1,000.00
50%
Scotty Lee Realty Corp.
1956
2,500.00
50%
Property acquired:
1954
Corporation formed:
1957]
1,875.00
25%
Edmul Realty Corp.
1958
This involved an intracorporate transaction. No total figure is available.
[1]↩
33 1/3%
Realita Realty Corp.
1958
[1]
16 2/3%
Ercal Realty Corp.
1959
333.33
16 2/3%
East Three Realty Corp.
1959
5,750.00
50%
225 E. 10th Street Corp.
1959
2,500.00
50%
East #1 Realty Corp.
1959
6,000.00
50%
East #7 Realty Corp.
1960
5,000.00
50%
East #8 Realty Corp.
1960
750.00
50%
East #9 Realty Corp.
1960
5,000.00
50%
East #10 Realty Corp.
1960
10,000.00
50%
3. This concession was made by Harry in the course of his testimony at the trial in the present case. In the absence from the record of the full pleadings of Harry in his State court litigation, we are not informed of his position in that case. ↩
4. This figure represents 50 percent of the total amount realized on the sale, the reduction having been made in accordance with sec. 1202.↩
5. It appears that additional interest income of item (6) relates to petitioner's ownership of mortgages whereas item (7) consists of bank interest.↩