PAUL FISHER AND MELINDA FISHER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Fisher v. Commissioner
Docket No. 39308-85.
United States Tax Court
T.C. Memo 1988-151; 1988 Tax Ct. Memo LEXIS 179; 55 T.C.M. (CCH) 585; T.C.M. (RIA) 88151; April 12, 1988. Towner Leeper, for the petitioners. Byron Calderon, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: Respondent determined deficiencies in and additions to petitioners' income taxes as follows: Addition to Tax
Year
Deficiency
Section 6653(b) [1]
1976
$ 27,822
$ 13,911
1977
$ 43,453
$ 21,727
*181 The issues for decision are: (1) whether additions to tax for fraud as provided by section 6653(b) are due from Paul Fisher [2] for the years 1976 and 1977; (2) whether the assessment of any deficiency due from the petitioners for 1976 or 1977 is barred by the statute of limitations; and (3) the amounts, if any, by which the adjusted gross income of petitioners for the years 1976 and 1977 are understated. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of facts and the exhibits associated therewith are incorporated herein by reference. Petitioners, Paul and Melinda [3] Fisher, husband and wife, resided in El Paso, Texas, during 1976 and 1977 and at the time of filig their petition. Their joint income tax returns for 1976 and 1977 were timely filed on or before April 15, 1977 and April 15, 1978, respectively, with the Internal Revenue Service Center in Austin. The returns reflected adjusted gross incomes of $ 12,261 in 1976 and $ 11,925 in 1977. *182 Paul Fisher graduated in 1957 from the University of Texas with a degree in business administration. While earning his degree, he completed a number of courses in accounting, business law and finance. During 1970 or 1971, Paul Fisher graduated in 1957 from the University of Texas with a degree in business administration. While earning his degree, he completed a number of courses in accounting, business law and finance. During 1970 or 1971, Paul Fisher entered into an oral partnership agreement with Albert McCardle. The partnership, known as McCardle and Fisher, continued through 1977. Under the oral agreement the only partners in the partnership were Paul Fisher and Albert McCardle; McCardle's contribution to the partnership was labor and services; Fisher's contribution to the partnership was money; and McCardle conducted the day-to-day operation of the partnership and was responsible for its banking transactions. On April 10, 1972, Paul Fisher purchased from his father (J. L. Fisher) a one-half interest in a store building in Lampasas for $ 21,000. In 1976, Paul Fisher's liability for part of the purchase price was reduced by payments made by petitioner to his father *183 totalling $ 7,479. In 1977, the liability was further reduced by similar payments totalling $ 3,150. On June 19, 1974, petitioner borrowed $ 30,000 from the First National Bank of Lampasas which he invested in a real estate limited partnership known as Crystal Park. This $ 30,000 was petitioner's total investment in the partnership and on the 1974 and 1975 joint returns, petitioner deducted losses from Crystal Park of $ 3,454.12 and $ 26,538.00, respectively. Petitioner's returns for 1976 and 1977 reflect no income or loss from the partnership but Paul Fisher made payments on the loan from the First National Bank of $ 4,000 in 1976 and $ 20,895.23 in 1977. During 1976 and 1977 and for several years prior thereto, Paul Fisher was an inveterate gambler. His gambling activities included substantial wagers on games of golf, poker, gin rummy, and football, as well as at the casinos in Las Vegas, Reno and other gambling resorts. He was also an accomplished golfer with a zero handicap and had been the proud winner in 1973 of the amateur section of the National Open of Mexico with his longtime friend and professional partner Lee Trevino. Paul Fisher was a member of several local *184 clubs including El Paso Country Club, Coronado Country Club and Vista Hills Country Club. He joined these clubs after concluding that he could make more money playing golf and poker at the clubs than his total costs of belonging. Nearly every day during the years at issue, Fisher played one or more golf matches on which wagers were made at one of the country clubs. Subsequent to the golf matches, he usually played poker or gin rummy at one of the clubs or at a private residence. Almost all wagers were paid in cash and no record was made of his winnings or losses. During the same period, Fisher also bet on football games by placing wagers by telephone with B. J. Chapman, also known as Bobby Chapman or Bobby Joe Chapman, a bookmaker in Dallas. Petitioner was not a bookmaker but he occasionally placed bets at no gain or loss in his name with Chapman for a friend or friends. Chapman did not attempt to settle up [4] with Fisher after each bet or at the end of each day or even at the end of each week of wagering. Instead, Chapman maintained a temporary record of their dealings and, when either of them wanted to settle up, payment would be promptly made by the net loser, usually *185 by mailing a cashier's check or checks to the other. The cashier's checks obtained by Fisher and sent to Chapman were not made payable to Chapman because Chapman's activities were illegal in Dallas and he did not want a record made of the payments to him. Instead, petitioner's cashier's checks were made out to fictitious payees. Chapman never deposited and seldom cashed one of the checks. When he had to cash one he just endorsed it for the fictitious payee and passed it on to some other party to deposit or cash. Most of the cashier's checks were used by Fisher and Chapman as cash because Chapman would simply hold the checks made payable to fictitious payees by Fisher until such time as Chapman had a balance due Fisher. At that time, the checks were returned to Fisher in settlement of the balance due. Fisher kept no record of the football wagers he made with Chapman. From one settlement date to the next Chapman kept a running account of the amount owed by or to Fisher but these records were destroyed when payment was made because Chapman did not want any incriminating records available to the local *186 authorities. The record contains no evidence that petitioner ever objected to the use of the cashier's checks being made payable to fictitious parties or to their use as a substitute for cash. In fact, at trial Chapman was under the impression that these arrangements were equally satisfactory to Fisher, and one of petitioner's former representatives, Gonzalo Diaz, told respondent's agent that Fisher had told him that the use of such cashier's checks was frequently employed by "dopers and gamblers" in order to avoid the tracing of the funds represented by the checks. The record contains no evidence of any denial of this statement by petitioner. It does contain a statement by respondent's agent that his investigation failed to reveal any evidence that Fisher was a "doper." Petitioners' income tax returns for 1976 and 1977 were prepared by Raymond M. Larkin, a certified public accountant in El Paso with 31 years of experience. Mr. Larkin also prepared the 1976 and 1977 information returns for the McCardle and Fisher partnership. For use in the preparation of petitioners' 1976 income tax return, Fisher provided Mr. Larkin with the books and records of the partnership and information *187 regarding the rental of the store building in Lampasas. Fisher did not provide Mr. Larkin with any record of his gambling activities in 1976 or advise Mr. Larkin that any gambling transactions had occurred during the year. The 1976 income tax return reflected all income and expenses with respect to which information was given to Mr. Larkin. In the course of preparing the 1977 return for the McCardle and Fisher partnership, Mr. Larkin had a discussion with Fisher concerning a cash transaction that occurred in 1978. The discussion prompted Mr. Larkin to ask whether petitioner had any gambling income in 1977. In reply, Fisher advised Mr. Larkin that he had received $ 15,000 in gambling income in 1977 but did not produce any record of his gambling transactions. The gambling income of $ 15,000 was reported on the 1977 return as "miscellaneous income." On November 16, 1977, Paul Fisher gave $ 27,700 in currency to University Bank in El Paso and caused $ 5,000 of the currency to be deposited in his personal checking account and the balance of $ 22,700 to be used to purchase three cashier's checks (numbers 15703, 15704 and 15705). University Bank prepared and filed with the Internal *188 Revenue Service a Currency Transaction Report, Form 4789, regarding the transaction. The report was received by the Internal Revenue Service no later than February 10, 1978. Philip Rocha, one of respondent's agents, began an examination of petitioners' 1976 and 1977 income tax returns with an interview of Paul Fisher on October 18, 1978. At that time, Mr. Rocha was aware of the November 16, 1977 currency transaction between petitioner and the University Bank. Fisher appeared at the interview without counsel and without any books or records. At the initial interview, Fisher stated that the $ 15,000 of miscellaneous income reported on the 1977 income tax return was from gambling, that the $ 15,000 was all the gambling income he received in 1977, and that he had no books or records reflecting his gambling activities. Fisher also told Mr. Rocha that during 1976 he had more gambling losses than winnings. During the initial interview, petitioner also stated to the agent that in 1976 and 1977 he realized no income other than the amounts shown on the returns, that he had no expenses or deductions which were not reported on the returns, that the returns were correct as filed, that *189 he had not received or made any loans during 1976 and 1977, and that the mortgage on his home represented the only loan he had outstanding during those years. When questioned by the agent about the currency transaction in November 1977, Fisher said that he could not recall the transaction and did not remember purchasing any cashier's checks at that date. Petitioner stated that he remembered purchasing a cashier's check for $ 3,000 in or about November of 1976 and that his normal practice during the years at issue was to deposit all of his income into his bank accounts and to pay almost all of his expenses with checks but occasionally with currency. Agent Rocha interviewed Paul Fisher again on November 20, 1978. During that interview, Paul Fisher stated that his normal practice was to deposit all of his gambling winnings into his checking account although he usually kept about $ 300 of currency in his wallet. A third interview of Paul Fisher by Mr. Rocha was held on December 1, 1978. At this interview, Mr. Rocha advised petitioner that an analysis of petitioner's bank deposits had disclosed a possible understatement of income for 1976 and 1977. Still a fourth interview *190 was had by Rocha with Paul Fisher on December 8, 1978. At this interview, petitioner stated that he still could not recall the currency transaction that occurred in November 1977, but that if such transaction had taken place, the currency involved was either proceeds of a loan or a cash withdrawal from the McCardle and Fisher partnership. When asked again about the apparent discrepancy between bank deposits and income reported on his 1976 and 1977 income tax returns, Paul Fisher's explanations were that the discrepancy could possibly be due to currency loans from his father, partnership withdrawals, or additional gambling income. Specifically, Paul Fisher stated that in 1977 he had a $ 7,000 currency loan from his father and a $ 26,000 currency withdrawal from the McCardle and Fisher partnership. On December 18, 1978, Paul Fisher was interviewed for the fifth time by Mr. Rocha. At this meeting, Paul Fisher produced his own version of an analysis of his bank deposits for 1977 which contained the following detail: Deposits
Source
$ 24,900.00
Withdrawals from checking accounts
$ 26,859.00
Cash withdrawal from partnership
$ 15,000.00
Reported gambling income
$  9,478.71
Cash-on-hand depletion
$ 76,237.71
*191 Paul Fisher told Mr. Rocha at this interview that if an item was income he would not have deposited it into his bank account. On February 5, 1979, in substantiation of the alleged loans from his father, Paul Fisher gave Rocha a letter postmarked December 21, 1978, from J. L. Fisher to petitioner. The letter stated "Oh yeah, I still have you on my books for the $ 12,000 in '76 and $ 7,000 in '77. You know it may be a cold winter." Agent Rocha had no further contacts with petitioner because the audit of the joint returns for 1976 and 1977 was completed by revenue agent Rick Schampers. Mr. Schampers also audited the partnership returns of McCardle and Fisher for 1976 and 1977. During the completion of the audit Mr. Schampers reconstructed petitioners' adjusted gross income for 1976 and 1977 by an analysis of their net worth increases during such years plus nondeductible expenditures. From this analysis, revenue agent Schampers concluded that for the taxable years 1976 and 1977 petitioners had understated their adjusted gross income by a total of $ 113,791.65 for 1976 and $ 104,703.01 for 1977 and their net incomes by $ 100,613.15 and $ 107,928.01, respectively. The *192 agent's computation of the omissions from income with adjustments for those items which were attributable to the McCardle and Fisher partnership is as follows: NET WORTH COMPUTATION
ASSETS:
12-31-75
12-31-76
12-31-77
Cash on hand
$   1,000.00 $   4,000.00
$  10,000.00
Cash in banks
(1,416.58)
4,086.64
10,260.47
Receivables
11,200.00 20,550.00
23,150.00
Prepaid interest
532.77 326.49
-0- Automobiles
-- -- 7,415.80
Escrow account on residence
323.00 122.25
-0- Real Estate
A. Residence
32,000.00 32,000.00
40,916.00
B. Store building,
Lampasas, Texas
43,533.00 43,533.00
43,533.00
Capital Account
McCardle and Fisher
Partnership
49,290.00 96,948.00
74,474.00
Total Assets
$ 136,462.19 $ 201,566.38
$ 209,749.27
LIABILITIES
Bank Loans
$  53,009.53 $  48,907.08
$  14,870.36
Casino loans
5,500.00 10,000.00
10,000.00
J. L. Fisher
22,000.00 14,521.00
11,371.00
Martin Bauman
7,750.00 4,750.00
1,750.00
Reserve for Depreciation
1,658.00 3,289.00
4,920.00
Total Liabilities
$  89,917.53 $  81,467.08
$  42,911.36
*193 NET WORTH COMPUTATION
12-31-75
12-31-76
TOTAL ASSETS
$ 136,462.19 $ 201,566.38 Less total liabilities
89,917.53 81,467.08 Net worth
$ 46,544.66 $ 120,099.30 Less net worth beginning of year
46,544.66 Increase to net worth
$ 73,554.64 PLUS:
Personal living expenses
19,408.98 Other nondeductible expenditures
35,700.00 TOTAL
128,663.62 Less nontaxable sources:
Payments from Gilbert Felts
(     550.00)
Insurance proceeds
(     592.97)
Capital gains deduction (section 1202)
(   1,468.00)
Adjusted Gross Income, corrected
$ 126,052.65 Adjusted Gross Income, reported
12,261.00 Total Adjusted Gross Income omitted
$ 113,791.65 Other adjustments:
Adjustments attributable to partnership:
Ordinary Income - plus (minus)
(   12,844.00)
Capital Gains
(      669.00)
Capital Gains deduction on above
334.50 Basis correction in park
Actual Understatement of Adjusted Gross Income
$ 100,613.15 *194 12-31-77
TOTAL ASSETS
$ 209,749.27 Less total liabilities
42,911.36 Net worth
$ 166,837.91 Less net worth beginning of year
120,099.30 Increase to net worth
46,738.61 PLUS:
Personal living expenses
21,439.40 Other nondeductible expenditures
48,450.00 TOTAL
$ 116,628.01 Less nontaxable sources:
Payments from Gilbert Felts
Insurance proceeds
Capital gains deduction (section 1202)
Adjusted Gross Income, corrected
$ 116,628.01 Adjusted Gross Income, reported
11,925.00 Total Adjusted Gross Income omitted
104,703.01 Other adjustments:
Adjustments attributable to partnership:
Ordinary Income - plus (minus)
5,346.00 Capital Gains
-- Capital Gains deduction on above
Basis correction in park
(    2,121.00)
Actual Understatement of Adjusted Gross Income
$ 107,928.01 During the audit by revenue agent Schampers, a criminal investigation with respect to Paul Fisher for the taxable years 1976 and 1977 was conducted by special *195 agent Edward Wagner. In an attempt to verify the loans made to Paul Fisher by his father, J. L. Fisher, Mr. Wagner attempted to interview both of petitioner's parents and when they failed to produce any evidence tending to corroborate the loans, he performed a detailed analysis of their various bank records. In all, Mr. Wagner found that approximately $ 661 in checks were drawn on J. L. Fisher's accounts during 1976 and 1977 that were payable to Paul Fisher or to cash. His analysis of Mrs. J. L. Fisher's accounts for the years 1976 and 1977 revealed slightly less than $ 600 in checks that were payable during 1976 and 1977 to Paul Fisher, members of his family, or cash. In respondent's net worth computation the liability at December 31, 1975 which is referred to as Casino loans in the total amount of $ 5,500.00 included $ 5,000.00 which Paul Fisher owed at that time to Caesar's Palace in Las Vegas. In May of 1976, this debt by Paul Fisher to Caesar's Palace was cancelled on the records of Caesar's Palace with a notation that the debt had been transferred from the account of Paul Fisher to the account of Lee Chagra. This transaction represented the satisfaction by Chagra to Paul *196 Fisher of a gambling debt and in the net worth computation, Casino loans at the end of 1976, did not include this $ 5,000.00. Respondent's net worth computation contains an asset entitled receivables which includes the balance owed by Albert McCardle at the end of each of the years 1975, 1975, and 1977 to Paul Fisher. The total amount of such receivables at the end of each of the years 1975, 1976, and 1977 was $ 11,200.00, $ 18,450.00, and $ 21,050.00, respectively. During each of the years 1975, 1976 and 1977, Paul Fisher purchased cashier's checks from University Bank. The cashier's checks which are in controversy in this case include one purchased in 1975, six purchased in 1976, and nine purchased in 1977. The numbers, dates, amounts, remitters, and payees reflected on these 16 checks are set out in the following schedule: Check
Number
Date
Amount
Remitter
Payee
1975
8094
12-24-75
$  7,500
Robert Miller
Robert Miller
1976
8734
03-05-76
$  3,000
McCardle & Fisher
Gene McCardle &
Gene Fisher
10429
08-24-76
$  6,100
Jack Miller
Jack Miller
10508
09-01-76
$12,500
McCardle & Fisher
Gene McCardle &
Gene Fisher
10509
09-01-76
$  2,100
Jack McCafferty
Jack McCafferty
11162
10-20-76
$  3,000
Jack McCafferty
Robert Miller
11690
12-20-76
$  9,000
McCardle or Fisher
Gene McCardle and
Gene Fisher
$ 35,700
1977
14908 *
09-09-77
$  7,550
Wayne Steinart
Wayne Steinart
15411
10-20-77
$  7,800
Gene Fisher
Jack Straus
15436
10-25-77
$  2,100
Gene Fisher
Jack Blakely
15703 *
11-16-77
$  7,000
Gene Fisher
Leroy Poole
15704
11-16-77
$  7,000
Gene Fisher
Robert Knapp
15705 *
11-16-77
$  8,700
Gene Fisher
Larry Kiel
15753
12-07-77
$  1,700
Gene Fisher
Jack Martin
15923 *
12-07-77
$  3,600
Gene Fisher
Charles Davis
15922
12-07-77
$  3,000
Gene Fisher
Charles Davis
48,450
*197 The reverse side of each of the above checks bears an endorsement by the payee or payees shown on the front thereof. The reverse side of check number 8094 also bears the initials "B. J. C." and was cashed in Dallas on January 14, 1976, by Bobby Chapman. All of the 1976 checks totaling $ 35,700 were cashed at the Merchant State Bank in Dallas. Of the 1977 checks a total of $ 26,850 (those bearing an asterisk) were cashed at the same place. The record fails to disclose who cashed these checks. With respect to the five checks in 1977 which were not cashed in Dallas, Paul Fisher advised respondent's agent as follows: I understand you are auditing my income taxes for 1976 and 1977 and have asked that I identify certain cashier's checks drawn on the University Bank of El Paso by me. After reviewing copies of the cashier's checks and endorsements thereon I am able to identify the following: * * * Cashiers checks [#]15411 for $ 7,800.00 -- payable to Jack Straus was cashed at the Valley Bank of Nevada, Las Vegas, Nevada to pay my gambling losses. Cashiers check #15436 for $ 2,100.00 -- payable to Jack Blakely was deposited to the Miller Gordon Motor Company in Dallas *198 and this represented a payment of gambling debts by me. Cashiers check #15704 for $ 7,000.00 -- payable to Robert Knapp was cashed at the Union Plaza, Las Vegas, Nevada. The Union Plaza is a casino in Las Vegas and the money was used to pay my gambling losses. Cashiers check #15753 for $ 1,700.00 -- payable to Jack Martin was cashed at the Valley Bank of Nevada, Las Vegas, Nevada, to pay my gambling debts. Cashiers check #15922 for $ 3,000.00 -- payable to Charles Davis was cashed at the Bank of Nevada, Las Vegas, Nevada, to pay my gambling debts. At trial Fisher testified to the same effect, but failed to explain how he was able to cash or otherwise apply the checks to his debts when they were made payable to Jack Strauss, Jack Blakely, Robert Knapp, Jack Martin and Charles Davis. He also failed to identify these parties or to assert whether the names were real or fictitious. During 1975, 1976 and 1977, Kelly Fisher, one of petitioner's dependent children was a full-time unemployed student. On July 16, 1975, she borrowed $ 3,431.64 from Franklin National Bank of El Paso to purchase a 1975 Toyota. Paul Fisher co-signed the note with his daughter and made *199 the payments on the loan to the bank during 1976 and 1977. The outstanding balance on the liability to the bank at December 31, 1975, 1975 and 1977 was reflected in respondent's net worth computation. Paul Fisher had an 85-percent interest in the McCardle and Fisher partnership during 1976. During 1977, he held a 50-percent interest in the partnership. During 1976 the partnership was engaged in several ventures. Its primary business was the sale of lots in Paso View Development. In 1976, the partnership also owned and operated a mobile home park known as Red Arrow Desert Oasis Park for which it had a separate bank account. In addition, the partnership operated a store known as Red Arrow Desert Oasis Store which also had a separate bank account. Revenue agent Schampers performed a thorough audit of the books and records of the McCardle and Fisher partnership. The audit included an examination of every liability ledger for each lot sold in the Paso View Development and an upward or downward adjustment for all the interest. Paul Fisher's capital account in the partnership as of December 31, 1975, as reflected on its 1975 return was $ 49,290. During 1976 and 1977, petitioner *200 made capital contributions to the partnership of $ 26,350 and $ 3,100 respectively. During 1976, petitioner made a cash withdrawal of $ 3,000. After adjustments revealed by the audit of the partnership records, petitioner's share of ordinary income and capital gains for 1976 was $ 21,372 and $ 2,936 respectively. After adjustments revealed by the audit of the partnership records, petitioner's share of its ordinary loss for 1977 was $ 837. On the 1977 partnership tax return, which was signed by Albert McCardle, withdrawals of property by Paul Fisher and Albert McCardle were reported in the amount of $ 26,858 [5] each. The return did not indicate that the partnership was terminated during 1977, that the partnership was not in business during the year, or that the 1977 return was a final return. Paul Fisher's 1977 Schedule K-1 contained no indication that his interest in the partnership terminated during the year. A sale to Albert *201 McCardle on January 1, 1977, of an "interest in Desert Oassi Park" was reported on petitioners' income tax return for 1977. The gross sales price was reported as $ 15,000 and the basis was reported as $ 26,858. The audit of the partnership records, resulted in a downward adjustment to the basis of property withdrawn by the partners in 1977 in the amount of $ 2,121. The above adjustments to the partnership return caused the capital account of Paul Fisher in McCardle and Fisher to be reflected as follows at the end of the years under consideration: December 31, 1975, balance:
$  49,290 1976: Capital contributions
26,350 Ordinary income
21,372 Capital gains
2,936 Cash withdrawal
(3,000)
December 31, 1976, balance:
$  96,948 1977: Capital contributions
3,100 Ordinary loss
(837)
Property withdrawal
(24,737)
December 31, 1977 balance:
$  74,474 On March 15, 1983, Paul Fisher was indicted in the United States District Court for the Western District of Texas on two counts of willfully attempting to evade and defeat income taxes for 1976 (Count 1) and 1977 (Count *202 2) in violation of section 7201 and two counts of willfully making false returns for 1976 (Count 3) and 1977 (Count 4) in violation of section 7206(1) Pursuant to a plea bargain agreement which was entered into by petitioner and his counsel with the United States Attorney and filed in the district court on September 14, 1983 Paul Fisher on October 21, 1983 pleaded guilty to Count 3 of the indictment (violation of section 7206(1) for 1976) and the other counts of the indictment were dismissed. Thereafter on March 5, 1984 petitioners executed an agreement on Form 872-A (Special Consent to Extend the Time to Assess Tax) extending the statutory period for the assessment of any income tax due for 1977 but only if section 6501(e) is applicable. Respondent executed the Form 872A on March 8, 1984. The record does not contain a Form 872T (Notice of Termination of Special Consent to Extend Time to Assess Tax) executed by either party for the purpose of terminating the extension agreed to in the Form 872-A. OPINION
1. Fraud
Both parties recognize that the key issue in this case is whether or not the returns filed by petitioners for 1976 and 1977 are fraudulent within the *203 meaning of section 6653(b). This is true because the resolution of this issue will not only dispose of the question of liability for the addition to tax under section 6653(b) but also the question of whether an assessment for either or both years is barred by the three year statute of limitations provided in section 6501(a). The burden of proof with respect to fraud is upon respondent. Section 7454(a); Rule 142(b). Part of respondent's burden is to establish by clear and convincing evidence that there is some underpayment in tax for each year. Plunkett v. Commissioner,465 F.2d 299, 303 (7th Cir. 1972) affg. a Memorandum Opinion of this Court; Hebrank v. Commissioner,81 T.C. 640, 642 (1983). Respondent undertook to carry this part of his burden of proof by use for the most part [6] of the net worth plus cash expenditures method of reconstructing income. The use of this method is proper in this case because petitioner admittedly failed to keep complete books and records during the years at issue. Under such circumstances respondent is authorized by section 446 to compute income by any method, which in his opinion, clearly reflects income. *204 See Moore v. Commissioner,722 F.2d 193, 196 (5th Cir. 1984), affg. a Memorandum Opinion of this Court; Sutherland v. Commissioner,32 T.C. 862 (1959). Furthermore, in such a case respondent has great latitude in adopting a method for reconstructing a taxpayer's income and the method adopted need only be reasonable in the light of all surrounding facts and circumstances. Giddio v. Commissioner,54 T.C. 1530, 1533 (1970); Schroeder v. Commissioner,40 T.C. 30, 33 (1963). The use of the net worth and cash expenditures method has long been accepted as a proper method of reconstructing income under circumstances similar to those in this case. See Holland v. United States,348 U.S. 121 (1954); *205 Cefalu v. Commissioner,276 F.2d 122 (5th Cir. 1960), affg. a Memorandum Opinion of this Court; Davis v. Commissioner,239 F.2d 187 (7th Cir. 1956), affg. a Memorandum Opinion of this Court; Lipsitz v. Commissioner,21 T.C. 917 (1954), affd. 220 F.2d 871 (4th Cir. 1955). In addition, in this case petitioners did not challenge the use of the method but only questioned the accuracy of respondent's computations in several respects. We will consider each of the questions raised by petitioners with respect to respondent's computations while keeping in mind that an error in part of the computation will not by itself destroy the validity of the remainder or invalidate the use by respondent of the net worth method. Marcello v. Commissioner,380 F.2d 494, 497 (5th Cir. 1967), affg. a Memorandum Opinion of this Court; Cefalu v. Commissioner, supra at 125; Harper v. Commissioner,54 T.C. 1121, 1129 (1970). First petitioners argue that the cash on hand at December 31, 1975 is understated in respondent's net worth computation by $ 7,500 with the result that their income for 1976 *206 is overstated in the computation by an equal amount. This argument is based on petitioners' claim that cashier's check number 8094 was still in petitioner's possession on December 31, 1975. The undisputed evidence on this point is that the cashier's check was purchased in El Paso by Paul Fisher on December 24, 1975 and that the check was thereafter forwarded by Fisher to Bobbyt Chapman who cashed it in Dallas on January 14, 1976. Both Paul Fisher and Chapman testified, and we have so found, that it was their practice for one of them to forward to the other a cashier's check upon settling up and that such checks were promptly forwarded on demand by the indebted party. This testimony as well as the undisputed dates when the check was purchased and cashed is clear and convincing evidence that the check was not still in the possession of Fisher on December 31, 1975 especially in view of Chapman's testimony that he would frequently hold such checks for extended periods of time after their receipt. The record contains no evidence from which a contrary inference can be drawn except Fisher's vague and uncorroborated testimony that to the best of his memory the check was still in his possession *207 on December 31, 1975. We of course are not bound to accept such testimony at face value even if it is uncontroverted, if as here, it is unreasonable or questionable from the record as a whole. Quock Ting v. United States,140 U.S. 417 (1891); Fleischer v. Commissioner,403 F.2d 403, 406 (2d Cir. 1968), affg. a Memorandum Opinion of this Court; Archer v. Commissioner,227 F.2d 270, 273 (5th Cir. 1955), affg. a Memorandum Opinion of this Court; Dougherty v. Commissioner,60 T.C. 917, 932-933 (1973). We conclude, therefore, that respondent has established that cashier's check number 8094 was not in Fisher's possession on December 31, 1975. Secondly, petitioners argue that respondent failed to give them credit for $ 5,000 in the net worth computation for the collection of a receivable from Lee Chagra in January, 1976. We have found that in respondent's net worth computation, the amount of petitioner's liability to Caesar's Palace was shown as $ 5,000 at the end of 1975 and zero at the end of 1976. We have also found that the reason the balance at the end of 1976 was zero is that in May of 1976 Lee Chagra satisfied *208 a gambling debt due to Paul Fisher by causing petitioner's debt of $ 5,000 to Caesar's Palace to be transferred to his (Chagra's) account at Caesar's Palace. Under the circumstances we are satisfied that respondent's computation with respect to this item is correct. Thirdly, petitioners argue that Paul Fisher received loans from his parents in 1976 of $ 12,000 and in 1977 of $ 7,000 for which no allowance was made in respondent's net worth calculation. In an attempt to corroborate Fisher's testimony to this effect, petitioners introduced a letter from his father which stated "Oh yeah, I still have you on my books for the $ 12,000 in 1976 and $ 7,000 in 1977. You know it may be a cold winter." Fisher testified that the letter, postmarked December 21, 1978, referred to the loans made to him in 1976 and 1977 and was "Dad's way of acknowledging the debt, and, in a very mild way, of asking * * * about payment of it." However, at the first meeting between Revenue Agent Rocha and petitioner, Paul Fisher told the agent that he had not received any loans in 1976 or 1977 and that the only loan payable he had outstanding at that time was the one on his house. At their fourth meeting *209 petitioner attempted to explain the discrepancy which the agent had found between deposits made by petitioner and the income reported on the 1977 return as being a loan of $ 7,000 from his father. At their fifth interview on December 18, 1978, petitioner provided Mr. Rocha with his own analysis of the bank deposits for 1977 which did not include a deposit identified as a loan from his father. However, on February 5, 1979, petitioner produced the letter postmarked December 21, 1978, which belatedly mentioned albeit in very indefinite terms both a loan in 1976 and one in 1977. Furthermore, Special Agent Wagner testified that when petitioner's parents failed to produce any evidence tending to corroborate the loans, he performed a detailed analysis of their bank records and was unable to identify any transaction which would tend to corroborate such loans; and at trial, petitioner's parents were both present but were not called by petitioner to corroborate the loans. Here, as noted, petitioner is challenging the accuracy of respondent's computations. In this situation the failure of a party to call such available witnesses who purportedly have knowledge about relevant facts is a sufficient *210 basis for an inference that the testimony of such witnesses would not have been favorable to the party. Kamborian v. Commissioner,56 T.C. 847 (1971), affd. 469 F.2d 219 (1st Cir. 1972); Pollack v. Commissioner,47 T.C. 92 (1966), affd. 392 F.2d 409 (5th Cir. 1968). [7]
Fourthly, petitioners argue that respondent improperly included in the net worth computation a $ 21,050 debt to Paul Fisher from Albert McCardle at the end of 1977 because the admitted debt was "totally worthless" at that time. The argument is without merit, however, since in a net worth computation assets are included at cost and the alleged inability of McCardle to pay the debt is not relevant. *211 Schultz v. Commissioner,278 F.2d 927 (5th Cir. 1960), revg. and remanding on another issue 30 T.C. 256 (1958); Cox v. Commissioner,54 T.C. 1735, 1741 (1970). [8]
Fifthly, on brief, petitioners argue that Paul Fisher had no capital interest in the McCardle and Fisher partnership on December 31, 1977 and that respondent erroneously included his capital account balance of $ 74,474 in the net worth computation. This argument is based on the assertion that Fisher sold his entire interest in the partnership to Albert McCardle on January 1, 1977. The record, however, contains no evidence which tends to directly support the assertion. In fact, the record as a whole clearly and convincingly establishes that petitioner disposed of only part of his partnership interest on January 1, 1977 and that at the end of 1977 he still had a partnership interest with a capital account balance of $ 74,474. This conclusion is not only supported by the partnership audit conducted by respondent's *212 agent but also by the 1977 partnership return which indicates that the two man partnership was still in business at the end of 1977 and that it was in business throughout the year. Neither the partnership return nor Paul Fisher's Schedule K-1 contain any indication that his partnership interest terminated during the year. Petitioners contend that the sale of Fisher's entire partnership interest was reported on their return for 1977. In support of this contention they point to the sale which we have found was reported on the 1977 return of Fisher's interest in Desert Oasis Park on January 1, 1977. Petitioners claim on brief that Desert Oasis Park, Paso View, and McCardle and Fisher are all different names for the same partnership entity and that the reported sale of his interest in Desert Oasis Park represented the disposition of his entire interest in the partnership. This claim is at odds, however, with the testimony of Mr. Larkin, who prepared the partnership return and who knew that Desert Oasis Park was only part of the partnership. It is also at odds with the 1977 partnership return and Fisher's K-1 both of which were prepared by Mr. Larkin, as well as our findings that *213 (1) during 1977 Fisher made capital contributions of $ 3,100 to McCardle and Fisher and (2) reported $ 4,510 in ordinary income from the partnership on Schedule E to his 1977 Form 1040. On the other hand, the sale of Desert Oasis Park on January 1, 1977 is clearly supported not only by petitioners' individual return for 1977 but by the fact that the 1976 partnership return of McCardle and Fisher contains transactions from Desert Oasis Park (including depreciation) but no such transactions are included in the 1977 partnership return. From all of the foregoing we conclude that respondent has established that Fisher did not dispose of his entire interest in the partnership on January 1, 1977 and that as of the end of the year he was still a partner in the partnership with a capital account balance of $ 74,474 as determined by respondent. Sixthly, petitioners argue that the net worth computation erroneously reduces a nonexistent debt by Paul Fisher to J. L. Fisher by $ 7,479 in 1976 and $ 3,150 in 1977. In support of this argument petitioners claim that the full amount of the purchase price of his father's interest in the Lampasas store, or $ 21,000 as recited in the deed, was paid *214 by Paul Fisher on the date of sale in 1972. On brief they point to the recital in the deed that the total consideration was $ 21,000 and Paul Fisher's self-serving statement at trial that the interest in the store was purchased under "the terms reflected in the deed." However, the argument ignores the fact that no specific terms of payment are recited in the deed and that respondent produced clear and convincing evidence that regular payments were made by Paul Fisher during the years at issue to his father and that such payments had been made since about the year of the purchase. [9] We conclude, therefore, that respondent's computation correctly reflects the payments during 1976 and 1977. Seventhly, petitioners claim that Paul Fisher disposed of his interest in the partnership, Crystal Park, in 1977 and respondent's net worth computation should be reduced by the $ 30,000 indebtedness to the First National Bank of Lampasas which he incurred in 1974 in order to make his investment in *215 the partnership. Petitioners' argument is unclear but as best we can ascertain he claims the reduction should be made in the form of a loss because he had to repay the $ 30,000 to the bank. In any event the argument is without merit because from the record as a whole it is clear, and we have so found, that his entire investment in the Crystal Park Limited Partnership was the $ 30,000 he obtained from the bank in 1974 and that on the returns for 1974 and 1975 he deducted as his share of the partnership losses a total of $ 29,992.12 ($ 3,454.12 for 1974 and $ 26,538.00 for 1977). Consequently any deduction in the years under consideration would be limited to his remaining basis of 88 cents in his partnership interest. We conclude, therefore, that no adjustment to this part of respondent's computation is warranted. Eighthly, petitioners argue that respondent's net worth computation erroneously includes payments made by Paul Fisher on a debt of his daughter, Kelly Fisher. We have found that Kelly Fisher was primarily responsible for the loan which was used by her to purchase a car. We have also found, however, that Paul Fisher co-signed her note; and the record clearly reflects that *216 the loan repayments during 1976 and 1977 were made by him and thus respondent's treatment of the loan is correct. In final analysis, petitioners' principal dispute with respect to respondent's net worth computation is that all of the cashier's checks, both those cashed at the Merchant State Bank in Dallas and those cashed elsewhere, totalling $ 35,700 in 1976 and $ 48,450, were erroneously included in respondent's net worth computation. Petitioners contend that all of these checks represent the payment of gambling debts by Paul Fisher and that under the facts involved in this case should not be used in such a manner as to reflect unreported income. Petitioners, however, overlook the fact that even if we assume without so finding that they are correct and that these checks represented the payment of gambling debts, the record would still contain clear and convincing evidence produced by respondent that their income was understated by $ 63,913.60 in 1976 and $ 58,478.01 in 1977. This is true because respondent's net worth computation clearly establishes that the source of the cashier's checks was not from reported income or from income which could otherwise be identified by respondent's *217 agents or by petitioners. Consequently, if adopted in toto, petitioners' argument with respect to these checks at best would lead to the conclusion that both gambling income and gambling losses were understated by the same amount. This conclusion is apparent from the fact that with the elimination of the cashier's checks respondent's computation would still reflect an understatement of income of $ 64,913.50 and $ 59,478.01 for 1976 and 1977, respectively, as reflected below: 1976
1977
Understatement per resp.
$ 100,613.50 $ 107,928.01 Less cashier's checks
<<fb>35,700.00>
<<fb>48,450.00>
64,913.50 59,478.01 Less concession by respondent [10]
<  1,000.00>
<  1,000.00>
Balance
$  63,913.50 $  58,478.01 From all of the foregoing we conclude that respondent has clearly and convincingly carried his burden of establishing an underpayment in petitioners' income tax for each of the years 1976 and 1977. We now turn to the question of whether respondent has carried his burden of proving by clear and *218 convincing evidence that at least some part of the underpayment in tax for each year was due to fraud on the part of Paul Fisher. Section 7454(a); Rule 142(b). The burden is met if respondent has shown by such evidence that Fisher intended to evade the payment of income taxes in each year which he knew to be owing by conduct intended to conceal, mislead or otherwise prevent the collection of such taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Webb v. Commissioner,394 F.2d 366 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983). The presence or absence of fraud is a question of fact to be determined from the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud is never presumed but must be established by affirmative evidence. Beaver v. Commissioner, 55 T.C. 85 (1970). It may, however, be proved by circumstantial evidence because direct proof of the taxpayer's intent is rarely *219 available. The taxpayer's entire course of conduct may be examined in order to determine whether the fraudulent intent is present. Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). From the record as a whole, we are satisfied that respondent has carried his burden of proving with clear and convincing evidence that the underpayment in income tax for 1976 and 1977 is due to the fraudulent acts of Paul Fisher for the following reasons: (a) During the years 1976 and 1977, Paul Fisher, a well educated, reasonably intelligent, mature individual with considerable experience in business, obviously knew that income from whatever source derived was taxable and that he was required to keep proper records of such income under the Internal Revenue Code. (b) He, however, admittedly kept no record of his winnings or his losses in his numerous and daily gambling activities. The failure to keep such records is some evidence of a fraudulent intent. Bradford v. Commissioner,796 F.2d 303 (9th Cir. 1986), affg. a Memorandum Opinion of this Court; *220 Grosshandler v. Commissioner,75 T.C. 1 (1980); Parsons v. Commissioner,43 T.C. 378 (1964). (c) In his gambling activities he used cash and its equivalent (cashier's checks made payable to fictitious parties) extensively. Such activities have been found to be evidence of fraud. Bradford v. Commissioner, supra;Gromacki v. Commissioner,361 F.2d 727 (7th Cir. 1966), affg. a Memorandum of this court. (d) The use of cashier's checks made payable to fictitious payees in his gambling activities obviously made it difficult if not impossible to trace payments or to reconstruct the various transactions in which he was involved. Engaging in such conduct the likely effect of which is to mislead or conceal has been held to be evidence of fraud. Spies v. United States,317 U.S. 492, 499 (1943). (e) During the audit of petitioners' returns Fisher repeatedly made false and misleading statements to respondent's agents. Such conduct is evidence of a fraudulent intent. *221 Grosshandler v. Commissioner, supra.
(f) On October 21, 1983 Paul Fisher pleaded guilty to having willfully made a false return for 1976 in violation of section 7206(1). Such a plea is some evidence of fraud with respect to 1976. See Wright v. Commissioner,84 T.C. 636 (1985).
2. Statute of Limitations
In view of our conclusion with respect to the fraudulent nature of the 1976 and 1977 returns the respondent's deficiency notice could have been issued at any time under section 6501(c) and, therefore, such notice was timely. Singleton v. Commissioner,606 F.2d 50 (3d Cir. 1979), affg. a Memorandum Opinion of this Court; Shaw v. Commissioner, 27 T.c. 561 (1956), affd. 252 F.2d 681 (6th Cir. 1958). We conclude, therefore that the assessment of the deficiencies and additions to tax are not barred by the statute of limitations.
3. Deficiencies
Petitioners have proceeded in this case on the assumption that they do not have to prove the correct amount of the deficiencies. In other words, they incorrectly contend that respondent has the burden of proving the correct amount of the deficiencies *222 due from petitioners for 1976 and 1977. Their error is aptly demonstrated by Bryan v. Commissioner,209 F.2d 822, 825 (5th Cir. 1954), affg. a Memorandum Opinion of this Court, cert. denied 348 U.S. 912 (1955), where the Court of Appeals stated: While ordinarily a determination of tax liability made by the Commissioner is presumptively correct and the burden rests upon the taxpapyer to prove it erroneous, in any proceeding involving the issue of fraud with intent to evade tax, the burden of proof with respect to the issue of fraud is upon the Commissioner. thus in any case where a deficiency in tax is determined by the Commissioner after the three year period of limitation has expired and the civil fraud penalty is asserted, the burden is upon the commissioner, in an appropriate proceeding where the validity of an assessment based upon such determination is contested, to establish by clear and convincing proof the existence of fraud. This, however, does not shift the burden of overcoming the presumptive correctness of the Commissioner's determination of deficiency from the taxpayer. When the commissioner establishes that the returns were fraudulent *223 and were filed with intent to evade tax, he has discharged the burden of proof imposed upon him by Section 1112, supra, and thereby the bar of the three year period of limitation is avoided. Thereafter, if the taxpayer is to escape the deficiency and the imposition of the civil fraud penalty, he must go forward with the proof and show that the determination of deficiency is erroneous. Since we are of this view, we reject the contention of the taxpayer that the Tax Court erred in holding that "once fraud is established, the statute of limitations does not apply and the petitioner must disprove the deficiencies." [Emphasis supplied; fn. ref. omitted.]
To the same effect see Harris v. Commissioner,174 F.2d 70 (4th Cir. 1949), affg. a Memorandum Opinion of this Court; Cohen v. Commissioner,176 F.2d 394 (10th Cir. 1949), affg. 10 T.C. 201 (1948), 9 T.C. 1206 (1947), 9 T.C. 1156 (1947), and two Memorandum Opinions of this Court; and Snell Isle, Inc. v. Commissioner,90 F.2d 481 (5th Cir. 1937), affg. *224 33 B.T.A. 1278 (1935), cert. denied 302 U.S. 734 (1937). As stated hereinbefore respondent had the burden of proving as part of his fraud case against Paul fisher that there was some underpayment in income tax due from petitioners for each of the years 1976 and 1977. We have found that respondent's net worth computation was more than sufficient to carry that burden. Consequently once the commissioner had carried his burfden of proving that the returns were fraudulent (including proof by the net worth computation that there was some underpayment in each year) the burden shifted to petiitoners to go forward with the proof and overcome the statutory presumption that the respondent's determination of the deficiencies is correct. Bryan v. Commissioner, supra.This petitioners have failed to do. Consequently, the respondent's determination of the deficiencies is sustained with the exception of the one concession made by respondent on brief. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. All rule references are to the Tax Court Rules of Practice and Procedure unless otherwise provided. ↩
2. The addition to tax under section 6653(b)↩ was not determined against Melinda Fisher in the statutory notice. 3. Melinda Fisher is a party to this action solely by virtue of having signed a joint return with Paul Fisher. All further references to petitioner in the singular are to Paul Fisher. ↩
4. Referred to at times by both Chapman and Fisher as "straightening up." ↩
5. On Paul Fisher's Schedule K-1, the withdrawal was reported as $ 26,859. Due to rounding problems, the basis to the partnership and value of the property at the time of distribution to the partner was reported on page 2 of his K-1 as $ 26,858. ↩
6. Part of the deficiency is due to specific adjustments made by respondent's agents to the partnership return of McCardle and Fisher. Petitioners have not objected to the partnership adjustments or to resulting adjustments to Paul Fisher's distributive share of the partnership profits and losses. ↩
7. We have considered petitioners' argument on brief that the parents were equally available as witnesses for respondent and his failure to call them gives rise to an inference that their testimony would have been adverse to respondent. In view of the relationship of the parties and the obvious hostility of the parents toward respondent we cannot agree. ↩
8. We note that petitioner does not claim and therefore we have not considered whether petitioner is entitled to a bad debt deduction under section 166. ↩
9. Here again the failure of petitioners to call the father who was available supports an inference that, if called, his testimony would not have been favorable to them. See note 7, supra.↩
10. On brief respondent conceded that club dues to the extent of $ 1,000 in each year were deductible by petitioners. ↩